Tyler M. Paetkau (Bar No. 146305)
E-mail: tyler.paetkau@procopio.com
Nicholas Kawuka (Bar No. 297579)
E-mail: nicholas.kawuka@procopio.com
PROCOPIO, CORY, HARGREAVES & SAVITCH LLP
1117 S California Ave, Suite 200
Palo Alto, CA 94304
Telephone: 650.645.9000
Facsimile: 619.235.0398

Attorneys for Plaintiffs Kraig Stahl and Gregory Loy,
on behalf of themselves and all of those similarly situated, and K.D.
Stahl Construction Group, Inc.

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRAIG STAHL and GREGORY LOY, on behalf of themselves and all of those similarly situated, K.D. STAHL CONSTRUCTION GROUP, INC., <br><br> Plaintiffs, <br><br> v. <br><br> SKYLINE CAPITAL BUILDERS LLC; SKYLINE CONSTRUCTION ENTERPRISES, INC., <br><br> Defendants. | Case No. **'22CV0528 AJB  MSB** <br><br> COMPLAINT FOR: <br><br> (1) DECLARATORY RELIEF (CODE CIV. PROC. § 1060); <br> (2) UNFAIR COMPETITION (CAL. BUS. & PROF. CODE § 17200); <br> (3) VIOLATION OF THE CARTWRIGHT ACT (CAL. BUS. & PROF. CODE & 16720); <br> (4) VIOLATION OF THE SHERMAN ACT (15 U.S.C. § 1 *ET SEQ*); <br> (5) VIOLATION OF CALIFORNIA LABOR CODE §§ 970-972; <br> (6) VIOLATION OF CALIFORNIA LABOR CODE § 2802; AND <br> (7) CIVIL PENALTIES UNDER THE PRIVATE ATTORNEYS GENERAL ACT OF 2004, CAL. LAB. CODE § 2698 *ET SEQ*. <br><br> DEMAND FOR JURY TRIAL |

Plaintiffs KRAIG STAHL ("Stahl"), GREGORY LOY ("Loy"), on behalf of themselves and all of those similarly situated, and K.D. STAHL CONSTRUCTION GROUP, INC. ("K.D. Stahl") (collectively, "Plaintiffs"), for their Complaint against

Defendants SKYLINE CAPITAL BUILDERS LLC, SKYLINE CONSTRUCTION ENTERPRISES, INC. (collectively, "Skyline"), allege as follows:

## INTRODUCTION

1.     Plaintiffs bring this action against Skyline based on Skyline's fraudulent "bait and switch" business tactics and practices.  Throughout early 2020 until November 2020, Skyline, which touts itself as an investor in commercial real estate and construction services firms, searched for a foothold in the local San Diego construction market.  To gain such access to the lucrative San Diego construction market, Skyline fraudulently induced both Stahl and Loy to accept employment at Respondent Skyline and to share their entity K.D. Stahl's confidential business information, including contacts, business opportunities, as well as assets including but not limited to employees.  Reasonably relying on Skyline's multiple misrepresentations, Stahl and Loy accepted employment with Skyline.  As Skyline had required, they also turned over their personal and their entity K.D. Stahl's valuable business assets, including but not limited to, customer information or accounts, employees, and other competitively sensitive information.  And as Skyline had required, Stahl and Loy also signed employment agreements with facially unlawful restrictive covenants.  After Skyline had obtained Plaintiff's valuable assets, Skyline abruptly terminated their employment without as much as notice or an opportunity to address any alleged issues that Skyline claims were the reason for their termination, leaving them empty-handed and unable to solicit their own employees back.

2.     This is an action for declaratory relief (Cal. Code Civ. Proc. § 1060), unfair competition pursuant to California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200); violations of the Cartwright Act (Cal. Bus. & Prof. Code § 16720); violations of the Sherman Act (15 U.S.C. §§ 1 *et seq*.), and violations of Labor Code §§ 970-972 and 2802.

3.     At its core, this dispute involves an oppressive scheme which, on information and belief, was masterminded by Skyline, Plaintiffs' former employer, in

which Skyline sought to harm Plaintiffs and other competitors in the construction industry.

4. Skyline does not compete and has not attempted to compete fairly in the marketplace. As part of its anticompetitive scheme, Skyline lures its personnel from their own jobs or opportunities, and then requires the new employees to sign facially unlawful, post-employment non-solicitation covenants in violation of California Business and Professions Code section 16600 and the case law interpreting it. On information and belief, each of Skyline's employment agreements at issue in this action (the "Employment Agreement") contains essentially the same restrictions which are facially violative of California law (notwithstanding that Skyline itself generally selects California law as the governing law for each of the employment agreements).

5. The Employment Agreement contains post-employment restrictions preventing former Skyline employees from soliciting customers and fellow employees:

> **Non-Solicitation of Employees/Consultants.** During Executive's employment with the Company and for a one (1) year period thereafter, Executive will not directly or indirectly solicit away employees or consultants of the Company for Executive's own benefit or for the benefit of any other person or entity, nor will Executive encourage or assist others to do so.

6. Ultimately, Skyline's use of unlawful provisions of the Employment Agreement has been done to prevent employee mobility and competition in the construction industry. Such efforts amount to an unlawful and unfair restraint of trade in violation of California law and Federal law.

7. Skyline, moreover, uses the Employment Agreement to unfairly and improperly restrain and interfere with the ability of Stahl, Loy, K.D. Stahl, and other competitors in the construction industry to recruit and hire qualified candidates.

8. Upon information and belief, Skyline is well aware of the existence of unlawful provisions in the Employment Agreement.

9. Upon information and belief, Skyline's efforts to use and enforce unlawful provisions of its Employment Agreement has been done to unlawfully secure its position in the marketplace, improperly profit for itself, and to harm Stahl, Loy, others similarly situated (the "putative class"), K.D. Stahl, and other competitors in the construction industry.

10. Accordingly, Plaintiffs are seeking to, *inter alia,* resolve an actual controversy with Skyline regarding the rights and obligations of the parties relating to, and arising from the Employment Agreement that Skyline entered into with various of its employees, including without limitation: Stahl, Loy, and the putative class.

11. Despite the fact that the Agreement is governed by California law, Skyline demands that under the Agreement, its former employees, including Stahl, Loy, and other members of the putative class, are restrained from engaging in a lawful profession, trade, or business that is in any way competitive with Skyline's business. On information and belief, Skyline also contends that its competitors have no right to require Skyline to comply with California law.

12. On information and belief, Skyline maintains that any business that employs any of Skyline's former employees is liable for improperly interfering with the Employment Agreement where such former employees discuss or communicate with any other Skyline employees, and/or where such former employees receive calls from former customers.

13. This dispute involves (a) whether Skyline's former employees, can be legally restricted pursuant to overly broad and unlawful restrictive covenants in the Employment Agreement from engaging in a lawful profession, trade, or business; (b) whether Stahl has acted properly in its relationship with the members of the putative class; and (c) whether Skyline has acted properly with respect to their relationships both with Plaintiffs and with the putative class.

14. This dispute also involves questions of whether former Skyline employees, such as Stahl, Loy, and members of the putative class, can solicit other

Skyline employees and former employees in the face of Skyline's Employment Agreement and the unlawful restrictions contained therein.

15. This dispute also involves whether Stahl, Loy, and other members of the putative class can hire former Skyline employees in the face of Skyline's practice of requiring employees to sign overly-broad restrictive covenants, and whether Skyline can use unlawfully broad restrictive covenants to prevent its former employees from accepting a position with competitors.

16. Furthermore, the dispute involves Skyline's violation of the Cartwright Act and the Sherman Act. Skyline has attempted to unlawfully and unreasonably restrain trade in violation of Section 16720 of the California Business and Professions Code and Section 1 of the Sherman Act. Specifically, Skyline's efforts to limit the ability of its employees and former employees to seek and obtain competitive employment, and the collateral efforts of preventing competitors in California (including Loy and Stahl, through their entity) from hiring such employees, has, among other things, suppressed competition in California and the United States as a whole and threatens to limit the ability of Skyline's employees to secure better compensation, benefits, and working conditions.

17. This dispute also involves whether Skyline can violate sections 970 through 972 of the California Labor Code by improperly soliciting employees to accept employment through misrepresentations.

18. The dispute further involves whether Stahl, Loy, and other members of the putative class are entitled to reimbursement by Skyline for all necessary business expenditures or losses incurred by them in direct consequence of the discharge of their duties for Skyline.

19. Plaintiffs' Claims for Relief alleged in the Complaint are timely and not barred under any applicable statute of limitations. On February 18, 2022, the Parties entered into a tolling agreement under which they agreed to toll any and all applicable limitations period while the Parties explored resolution of their dispute through

mediation.   On April 15, 2022, the Parties concluded mediation efforts.   Thus, Plaintiffs have timely asserted the Claims for Relief in the Complaint.

### The Parties, Jurisdiction, and Venue

20.    At all relevant times, Stahl was and is an individual who resided in the State of Texas prior to his employment with Skyline.

21.    At all relevant times, Loy was and is an individual who resided in the State of California prior to his employment with Skyline.

22.    Plaintiffs are informed and believe, and on that basis allege, that at all relevant times, Skyline was a California limited liability company with its principal place of business in Walnut Creek, California.

23.    Skyline hires construction industry professionals throughout the United States, and markets and sells products and services throughout the United States. Skyline's activities, including the recruitment and hiring activities at issue in this Complaint, as well as its sale of products and services are in the flow of and substantially affect interstate commerce.

24.    The Court has subject matter jurisdiction under Section 4 of the Sherman Act, 15 U.S.C. § 4, and under 28 U.S.C. §§ 1331 and 1337 to prevent and restrain Skyline from violating Section 1 of the Sherman Act, 15 U.S.C. § 1.  The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. §§ 1367.

25.    Venue is proper in this judicial district under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391(b)(2), (c). Skyline transacts or has transacted substantial business in this district.

### GENERAL ALLEGATIONS

### The Putative Class and the Employment Agreements

26.    Stahl and Loy, like the other members of the putative class, have or had an employment relationship with Skyline.

27.    Stahl and Loy, like the other members of the putative class, worked in the construction industry prior to accepting employment with Skyline.

28.     Stahl was employed by Skyline from November 30, 2020 to March 26, 2021, during which he worked as the Project Executive for Skyline.

29.     In connection with Stahl's employment with Skyline, Skyline required that Stahl sign Skyline's Employment Agreement.  Attached as **Exhibit 1** is a true and correct copy of Stahl's Employment Agreement with Skyline.

30.     Skyline employed Loy from November 30, 2020 to May 21, 2021, during which he worked as the Director of Preconstruction and Estimating for Skyline.

31.     In connection with Loy's employment with Skyline, Skyline required that Loy sign Skyline's Employment Agreement.  Attached as **Exhibit 2** is a true and correct copy of Loy's Employment Agreement with Skyline.

32.     On or about March 26, 2021, Skyline abruptly terminated Stahl's employment.

33.     On or about May 21, 2021, Skyline abruptly terminated Loy's employment.

**Skyline Unlawfully Prevents Legitimate Competition And Employee Mobility**

34.     Skyline employs improper restrictive covenants in an effort to prevent its employees from leaving, from accepting employment with competitors in the construction industry, and to prevent competitors like Stahl, Loy, through their entity from offering employment to, and employing, Skyline's existing or former employees.

35.     At its heart, Skyline's scheme is nothing more than an effort to prevent competitors like Stahl and Loy, through their entity, from competing with Skyline, and to prevent Skyline's employees from accepting competitive positions with competitors.

36.     It is clear, therefore, that Skyline's unlawful covenants preclude Skyline's existing and former employees from engaging in lawful competition.  By extension, the same covenants preclude Stahl, Loy and members of the putative class, through their respective entities, from lawfully competing with Skyline in California. At the very least, it is apparent that Skyline's unlawful restrictions are intended to and

actually achieve the purposes of restricting employee mobility, and preventing employees from engaging in their chosen professions while working for themselves or anyone other than Skyline in California and throughout the United States.

### Skyline's Violations of the Cartwright Act and the Sherman Act

37. Skyline is engaged in the construction industry, as are Stahl and Loy through their entity – K.D. Stahl Construction Group, Inc. Skyline and Stahl and Loy (through their entity) are direct competitors in certain aspects of the construction industry.

38. Skyline and K.D. Stahl are both enterprises at the same level of distribution with respect to providing general contracting services.

39. Despite being at the same level of distribution, Skyline has entered into unlawful agreements with its employees (including the members of the putative class), the primary and direct purpose of which is to restrain competition between itself and actual and potential competitors in the construction industry.

40. Skyline requires all of its employees to enter into the Employment Agreement (or variations of the same) containing the unlawful restrictions, among other reasons, in order to limit the employees' ability to negotiate for a more favorable job in the industry, including higher compensation and better benefits.

41. Skyline's anticompetitive efforts have had, among other things, the following effects in California and across the United States: (a) suppressed competition between and among competitors in the construction industry; and (b) limited Skyline's former employees' ability to secure employment, as well as better compensation, benefits, and working conditions; and (c) restricted lawful competition by discouraging and even preventing employees from accepting a position with a competitor like K.D. Stahl.

42. Skyline's agreements with unlawful restrictions constitute unreasonable restraints of trade that are per se unlawful under Section 1 of the Sherman Act, 15

U.S.C. § 1 and the Cartwright Act.  Skyline's agreements with unlawful restrictions also constitute unreasonable restraints under the rule of reason.

43.    Plaintiffs have been injured as a result of Skyline's unlawful efforts to restrain lawful competition in the construction market.

## CLASS ALLEGATIONS

### Class 1

44.    Upon information and belief, Skyline has a practice of including in its employment agreements and offer letters to its California employees certain anti-competitive non-solicitation of employees provisions that are facially unlawful, void and unenforceable under California law.

45.    Skyline's inclusion of facially unlawful non-solicitation of employees provisions in its offer letters and employment agreements directly undermines the fundamental statutory policy (articulated in California Business and Professions Code section 16600) favoring competition and employee mobility.  Skyline's mere inclusion of the unlawful non-solicitation provisions undermines and inhibits competition and employee mobility, because the average employee would honor the unlawful provision without consulting counsel or challenging the provision in court.  Additionally, the mere inclusion of the unlawful non-solicitation provisions discourages employees from terminating their employment with Skyline and seeking employment with a competitor or forming a competing business, because the unlawful provisions place a substantial segment of the market off limits to the employees and restrict their ability to earn a living and their mobility in their chosen profession, the construction industry.

46.    Stahl and Loy bring the Causes of Action on behalf of themselves and all others similarly situated.  The first class (**Class 1**) is defined as follows:

> All persons currently or formerly employed by Skyline in California at any time during the period beginning four years before the filing of the initial complaint in this action and ending when notice to the Class is sent who received an offer letter from Skyline or who Skyline required to execute any agreement that contained a facially unlawful post-employment restrictive covenant made unlawful under Business and Professions Code section 16600 and *AMN Healthcare, Inc. v. Aya Healthcare Services, Inc.*, 28 Cal. App. 5th 923 (Ct. App. 2018).

47.     Stahl and Loy are informed and believe that Skyline employed many employees in California during the period from its formation to the present.  Stahl and Loy do not, as yet, know the exact size of the class size because such information is in the exclusive control of Skyline.  Stahl and Loy are informed and believe that Skyline employed more than the minimum number of employees required for a class action.

48.     Stahl and Loy are informed and believe that Skyline included, and continues to include, unlawful non-solicitation of employee provisions in its employment agreements with and/or offer letters to some of its California employees.

49.     The questions of law or fact common to **Class 1** include without limitation:

      a.     Whether the non-solicitation of employees provisions in Skyline's employment agreements with and offer letters to its California employees are unlawful, void and unenforceable under Business and Professions Code section 16600;

      b.     Whether the class members are entitled to declaratory relief that they have the immediate right to solicit Skyline's employees, and that Skyline's non-solicitation of employees provisions are unlawful, void and unenforceable;

      c.     Whether Skyline's mere inclusion of the facially unlawful non-solicitation provisions constitutes unlawful, unfair and/or fraudulent business acts or practices prohibited by California Business and Professions Code sections 17200, *et seq*.; and

      d.     The type and measure of damages suffered by Stahl, Loy, and the class.

50.     These and other questions of law and fact are common to the class, and predominate over any questions affecting only individuals in the class.

## Class 2

51.     Upon information and belief, Skyline has a policy and practice of not reimbursing employees for use of services such as internet service when employees

are working at locations other than its physical offices, forcing its employees, including Stahl, Loy, and class members to engage in company business but undertake such costs at their own expense. Skyline also has a policy and practice of requiring employees to participate in company-related travel but not reimbursing such employees for such travel for business purposes.

52. Skyline's policies and practices on reimbursement violate Labor Code section 2802, which requires employers to reimburse its employees for expenses incurred in the discharge of their employment duties. Skyline's violation of Labor Code section 2802 also constitutes an unlawful, unfair and/or fraudulent business act or practice prohibited by California Business and Professions Code sections 17200 *et seq*.

53. Stahl and Loy bring the Causes of Action on behalf of themselves and all others similarly situated. The second class (**Class 2**) is defined as follows:

> All persons currently or formerly employed by Skyline in California at any time during the period beginning four years before the filing of the initial complaint in this action and ending when notice to the Class is sent who used their personal electronic devices, telephones, software, voicemail services or internet service providers to perform work for Skyline, or who participated in work-related travel, and incurred other business-related expenses but were not compensated for such business-related expenses.

54. Stahl and Loy are informed and believe that Skyline employed many employees in California during the period from its formation to the present. Stahl and Loy do not, as yet, know the exact size of the class size because such information is in the exclusive control of Skyline. Stahl and Loy are informed and believe that Skyline employed more than the minimum number of employees required for a class action.

55. The questions of law or fact common to **Class 2** include without limitation:

a. Whether Skyline had a policy and practice of not reimbursing employees for use of their personal computers, phones, internet service providers for business purposes;

b.      Whether Skyline had a policy and practice of requiring employees to participate in company-related travel;

c.      Whether Skyline had a policy and practice of not reimbursing employees for the use of their personal computers, phones or internet service providers for business purposes;

d.      Whether Skyline had a policy and practice of not reimbursing employees for such travel for business purposes;

e.      Whether Skyline's policies and practices on reimbursement violate Labor Code section 2802;

f.      Whether Skyline's policy of not reimbursing employees in violation of Labor Code section 2802 constitutes an unlawful, unfair and/or fraudulent business act or practice prohibited by California Business and Professions Code sections 17200, *et seq*.; and

g.      The type and measure of damages suffered by Stahl, Loy, and the class.

56.     Stahl and Loy's claims are typical of the claims of the class.

57.     Stahl and Loy will fairly and adequately represent the interests of the class and have no conflict with the interests of the class.

58.     Stahl and Loy have retained competent counsel experienced in employment, restrictive covenants, unfair competition and class action litigation to represent them and the class.

59.     Skyline has acted on grounds generally applicable to the class, thereby making final injunctive relief appropriate with respect to the class as a whole.

60.     This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.  Prosecution as a class action will eliminate the possibility of repetitive litigation.  There will be no material difficulty in the management of this action as a class action.  By contrast, prosecution of separate actions by individual class members would create the risk of inconsistent or varying

adjudications, establishing incompatible standards of conduct for Skyline and its current and former California-based employees.

**FIRST CLAIM FOR RELIEF – DECLARATORY RELIEF**

**(Cal. Code Civ. Proc., § 1060)**

**(Stahl and Loy, on behalf of themselves and all others similarly situated v. Skyline)**

61.     Plaintiffs hereby restate the allegations set forth in Paragraphs 1 through 60 of this Complaint as if fully set forth herein.

62.     The terms of the Employment Agreement are overly broad or otherwise unlawful, and are hindering the ability of Skyline's former employees, including Stahl, Loy, and the other members of the putative class (among others), to engage in their chosen lawful profession, trade, or business in violation of California law and any other laws.

63.     Given the putative class' relationship with Stahl and Loy, Skyline's conduct is also hindering Stahl and Loy's right to engage in a lawful business, and Stahl and Loy's rights as employers of *inter alia* California employees, and the rights of such employees to engage in their chosen lawful profession, trade or business.

64.     The restrictive covenants in the Employment Agreement constitute illegal restraints of trade in the State of California and are void against the applicable public policy of the State of California, or any other laws and policies.

65.     Plaintiffs seek a declaratory judgment that restrictive covenants in the Employment Agreement are void as against the applicable public policy. Indeed, the restrictive covenants are facially invalid under Business and Professions Code §16600.

66.     K.D Stahl also seeks a declaratory judgment that it is not wrongfully interfering with any legally enforceable aspects of the Employment Agreement when it allows former Skyline employees, who are now K.D. Stahl employees, to communicate with or otherwise recommend former colleagues at Skyline for employment at K.D. Stahl.

67.     An actual and justiciable controversy exists between Skyline on the one hand, and Loy, Stahl, and members of the putative class, on the other.  On information and belief, Skyline takes the position that it is legally entitled to act against Stahl, Loy, and members of the putative class pursuant to the restrictive covenants in its Employment Agreement(s). Stahl, Loy, and members of the putative class believe that Skyline does not have such rights under California law.

68.     Plaintiffs intend to lawfully compete against Skyline, and Stahl and Loy, through their entity, intend to employ Skyline's current and former employees including, without limitation, members of the putative class.  As a result, Plaintiffs have reasonable belief that Skyline will use and enforce unlawful provisions of the Employment Agreement in an effort to prevent its current and former employees from accepting employment with Stahl or Loy, and otherwise unduly limiting their activities and impairing their rights to compete fully and fairly in California.

69.     For these reasons, Plaintiffs are uncertain with respect to their rights.

70.     This controversy necessitates a determination of this dispute to protect Plaintiffs from the uncertainty and insecurity described above.

71.     The ends of justice require a declaratory judgment that the restrictive covenants in the Employment Agreement are overly broad and unenforceable under applicable California law or any other allegedly applicable laws, and constitute illegal restraints of trade.

72.     If the overly broad post-employment restrictions are enforced, trade will be unlawfully restrained, Plaintiffs will be irreparably harmed by the inability to work with Skyline's former employees, including without limitation, members of the putative class, and Stahl, Loy, and such former Skyline employees will suffer irreparable harm.

73.     Plaintiffs respectfully request a declaratory judgment providing a declaration of the rights and legal relations between the parties and holding that the restrictive covenants in the Employment Agreement are overly broad and

unenforceable under applicable California law or any other allegedly applicable laws and constitute illegal restraints of trade.

### SECOND CLAIM FOR RELIEF – UNFAIR COMPETITION

**(Cal. Bus. & Prof. Code §§ 17200 *et seq.*)**

**(Stahl and Loy, on behalf of themselves and all others similarly situated v. Skyline)**

74.     Plaintiffs hereby restate the allegations set forth in Paragraphs 1 through 73 of this Complaint as if fully set forth herein.

75.     This cause of action for unfair competition is brought to find and declare that Skyline's use and/or enforcement of the unlawful provisions of the Employment Agreement to achieve its anticompetitive purpose, constitutes unfair competition in violation of, *inter alia,* California Business and Professions Code Section 17200, California's Unfair Competition Law.  *(See, e.g., Robinson* v. *U-Haul Co. of California* (2016) 4 Cal.App.5th 304, 318, 209 Cal.Rptr.3d 81, 92 [strategic use of litigation and threatened litigation to intimidate former dealers from setting up business relations with defendant's competitors was an unlawful business practice under § 17200].)

76.     It violates California's Unfair Competition Law for Skyline to use, enforce or threaten to enforce agreements containing facially invalid or overly broad restrictive covenants against its former employees, such as Stahl, Loy, the other members of the putative class.

77.     As a company authorized to do business in California, Skyline should be required to comply with California law, including California's Unfair Competition Law. Likewise, since Skyline's principal place of business is located in California, it is not free to violate California's public policies and law while reaping the benefits of doing business in California.

78.     Skyline's unfair competition has injured Plaintiffs and other competitors in the construction industry by reducing the field, or trying to reduce the field, of

qualified employees who could work for a competitor without breaching any valid agreement.

79.     The cause of action is also brought to find and declare that Skyline's failure to reimburse employees for necessary business expenses in violation of Labor Code section 2802 is unlawful, unfair and fraudulent under Business and Professions Code Section 17200, California's Unfair Competition Law.

80.     Plaintiffs have lost money or property as a result of Skyline's unfair competition. Plaintiffs have had to expend time, energy and money, including but not limited to out-of-pocket payment of costs and expenses, towards investigating and defending their rights in response to Skyline's unfair competition.

81.     Plaintiffs have no adequate remedy at law. Accordingly, Skyline's pattern of business activity in which it seeks to intimidate former employees from setting up business relations with Stahl through the use of litigation and threatened litigation to enforce facially invalid and/or overly broad restrictive covenants should be preliminarily and permanently enjoined, along with ancillary conduct that improperly restrains competition.

## THIRD CLAIM FOR RELIEF – VIOLATION OF CARTWRIGHT ACT

### (Cal. Bus. & Prof. Code §§ 16720 *et seq.*)

### (Stahl, Loy and K.D. Stahl v. Skyline)

82.     Plaintiffs hereby restate the allegations set forth in Paragraphs 1 through 81 of this Complaint as if fully set forth herein.

83.     Skyline is engaged in the sales and provision of general contracting services.

84.     Skyline has engaged in conduct for the purpose of unreasonably restraining trade in California in violation of Section 16720 of the California Business and Professions Code.

85.     Skyline's anticompetitive behavior has had, among other things, the following direct and primary purpose to restrain trade in California: (a) suppressed

competition between and among businesses in the construction industry; and (b) limited employee mobility and the ability of former Skyline employees to secure employment, as well as better compensation, benefits, and working conditions.

86.     Additionally, Stahl, Loy, and K.D. Stahl have been injured as a result of Skyline's violation of Section 16720 as Skyline has used their anticompetitive behavior to prevent its former employees, and individuals like Stahl and Loy, as well as companies like K.D. Stahl who would employ those former employees, from lawfully competing in the construction industry.

87.     In addition to the actual damages sustained as a result of Skyline's wrongful conduct, Stahl, Loy, and K.D. Stahl have been irreparably harmed and have no adequate remedy at law.

88.     Stahl, Loy, and K.D. Stahl bring this claim pursuant to Section 16750 to recover three times the damages sustained by them, interest on its actual damages pursuant to Section 16761, preliminary and permanent injunctive relief, and reasonable attorneys' fees together with the costs of the suit.

## FOURTH CLAIM FOR RELIEF – VIOLATION OF SHERMAN ACT

### (15 U.S.C. §§ 1 *et seq.*)

### (Stahl, Loy and K.D. Stahl v. Skyline)

89.     Plaintiffs hereby restate the allegations set forth in Paragraphs 1 through 88 of this Complaint as if fully set forth herein.

90.     Skyline is engaged in the sales and provision of general contracting services.

91.     Skyline has engaged in activity for the purpose of unreasonably restraining trade in California in violation of Section 1of the Sherman Act.

92.     Skyline's anticompetitive behavior has had, among other things, the following direct and primary purpose to restrain trade in California: (a) suppressed competition between and among businesses in the construction industry; and (b)

limited employee mobility and the ability of former Skyline employees to secure employment, as well as better compensation, benefits, and working conditions.

93.    Additionally, Stahl, Loy, and K.D. Stahl have been injured as a result of Skyline's violation of Section 1 as Skyline has used their anticompetitive behavior to prevent its former employees, and individuals like Stahl and Loy, as well as companies like K.D. Stahl who would employ those former employees, from lawfully competing in the construction industry.

94.    In addition to the actual damages sustained as a result of Skyline's wrongful conduct, Stahl, Loy, and K.D. Stahl have been irreparably harmed and have no adequate remedy at law.

95.    Stahl, Loy, and K.D. Stahl bring this claim pursuant to Section 1 to recover three times the damages sustained by them, interest on its actual damages as authorized at law, preliminary and permanent injunctive relief, and reasonable attorneys' fees together with the costs of the suit.

## FIFTH CLAIM FOR RELIEF –

## FRAUD IN THE INDUCEMENT OF EMPLOYMENT CONTRACT

### (Violation of California Labor Code §§ 970-972)

### (*Stahl v. Skyline*)

96.    Plaintiffs refer to and incorporate each and every allegation set forth in paragraphs 1 through 95, inclusive, of this Complaint as though fully set forth herein.

97.    California Labor Code section 970 provides:

No person, or agent or officer thereof, directly or indirectly, shall influence, persuade, or engage any person to change from one place to another in this State or from any place outside to any place within the State, or from any place within the State to any place outside, for the purpose of working in any branch of labor, through or by means of knowingly false representations, whether spoken, written, or advertised in printed form, concerning either:

(a)  The kind, character, or existence of such work;
(b)  The length of time such work will last, or the compensation therefor;
(c)  The sanitary or housing conditions relating to or surrounding the work;
(d)  The existence or nonexistence of any strike, lockout, or

other labor dispute affecting it and pending between the proposed employer and the persons then or last engaged in the performance of the labor for which the employee is sought.

(Enacted by Stats. 1937, Ch. 90.)

98.   Defendants made false representations to induce and persuade Plaintiff Stahl to move to San Diego, California for work at Skyline.  Defendants made misrepresentations about numerous things, including but not limited to, the kind, character, or existence of work, the length of time work would last, the duration of employment at Skyline, the compensation Stahl and Loy would get for work, and the conditions of the work.

99.   Defendants' representations were not true.

100.   Defendants knew when the representations were made that the representations were not true.

101.   Defendants intended that Stahl rely on the representations.

102.   Stahl reasonably relied on the representations and changed from their respective locations to San Diego for the purposes of accepting employment with and working for Defendants Skyline.  For example, but for the misrepresentations, Stahl would not have agreed to transfer K.D. Stahl employees to Skyline and would not have agreed to move to San Diego to work for Skyline.

103.   Stahl was harmed by Defendants' fraudulent inducement of employment in violation of California Labor Code section 970, in an amount to be proved at the hearing of this action.

104.   Stahl's reliance on Defendants' representations was a substantial factor in causing his harm.

105.   Plaintiff Stahl requests all remedies available to him under California Labor Code section 971-972, including double damages, injunctive relief and attorney's fees.  Cal. Lab. Code §§ 971 ("Any person, or agent or officer thereof, who violates Section 970 is guilty of a misdemeanor punishable by a fine of not less than

fifty dollars ($50) nor more than one thousand dollars ($1,000) or imprisonment for not more than six months or both"); 972 ("In addition to such criminal penalty, any person, or agent or officer thereof who violates any provision of Section 970 is liable to the party aggrieved, in a civil action, for double damages resulting from such misrepresentations.  Such civil action may be brought by an aggrieved person or his assigns or successors in interest, without first establishing any criminal liability.").

## SIXTH CLAIM FOR RELIEF –

## FAILURE TO REIMBURSE ALL NECESSARY BUSINESS EXPENSES

### (Violation of California Labor Code § 2802)

### (Stahl and Loy, on behalf of themselves and all others similarly situated v. Skyline)

106.   Stahl and Loy, on behalf of themselves and all others similarly situated, hereby refer to and incorporate each and every allegation set forth in paragraphs 1 through 105, inclusive, of this Complaint as though fully set forth herein.

107.   In discharging their duties for Skyline, Stahl, Loy, and other class members routinely incurred necessary business expenses, including without limitation use of their own internet service providers, personal vehicles and offices supplies, and paying for their own work-related travel expenses.

108.   Skyline failed and/or refused to reimburse Stahl, Loy, and other class members for expenses they incurred in the direct discharge of their employment duties for Skyline, in violation of California Labor Code section 2802.

109.   Skyline's conduct resulted in harm to Stahl, Loy and the class members, in an amount to be proved at the trial of this action.

/ / /

/ / /

**SEVENTH CLAIM FOR RELIEF –**

**CIVIL PENALTIES UNDER THE PRIVATE ATTORNEYS GENERAL ACT**

**OF 2004, CAL. LAB. CODE §§ 2698 *ET SEQ*.**

**(*Stahl and Loy v. Skyline*)**

110.   Plaintiffs incorporate by reference and re-allege as if fully stated herein paragraphs 1 through 109 of this Complaint as though fully set forth herein.

111.   At all times herein mentioned, Defendants were subject to the Labor Code of the State of California and the applicable Industrial Welfare Commission Orders. California Labor Code section 2699(a) specifically provides for a private right of action to recover penalties for violations of the Labor Code: "Notwithstanding any other provision of law, any provision of this code that provides for a civil penalty to be assessed and collected by the Labor and Workforce Development Agency or any of its departments, divisions, commissions, boards, agencies, or employees, for a violation of this code, may, as an alternative, be recovered through a civil action brought by an aggrieved employee on behalf of himself or herself and other current or former employees pursuant to the procedures specified in Section 2699.3."

112.   Plaintiffs have exhausted their administrative remedies pursuant to California Labor Code section 2699.3.  On December 3, 2021, Plaintiffs gave written notice by online filing to the Labor and Workforce Development Agency and by certified mail to Defendants of the specific provisions of the Labor Code that Defendants have violated against Plaintiffs and current and former aggrieved employees, including the facts and theories to support the violations.  Specifically, Plaintiff asserted that as a result of their unlawful provisions in the Employment Agreements, Defendants violated California Labor Code section 432.5 which states in pertinent part:

> No employer, or agent, manager, superintendent, or officer thereof, shall require any employee or applicant for employment to agree, in writing, to any term or condition which is known by such employer, or

agent, manager, superintendent, or officer thereof to be prohibited by law.

113.   Plaintiffs also asserted that Defendants had violated California Business and Professions Code sections 16600 and 17200.

114.   At the time of this filing, over 65 days have elapsed since Plaintiffs provided notice and the Labor and Workforce Development Agency has not indicated that it intends to investigate Defendants' Labor Code violations discussed in the notice. Defendants also failed to cure within the time allotted by PAGA.  Thus, Plaintiffs may commence a civil action to recover penalties under Labor Code section 2699 pursuant to Section 2699.3 for the violations of the Labor Code described in this Complaint. These penalties include, but are not limited to, penalties under California Labor Code section 2699(f)(2) and all other provisions of the Labor Code.

115.   Based on the conduct described in this Complaint, Plaintiffs are entitled to an award of civil penalties on behalf of Plaintiffs, the State of California, and similarly Aggrieved Employees of Defendants.  The exact amount of the applicable penalties, in all, is in an amount to be shown according to proof at trial.  These penalties are in addition to all other remedies permitted by law.

116.   In addition, Plaintiffs seek an award of reasonable attorney's fees and costs pursuant to California Labor Code section 2699(g)(1), which states, "Any employee who prevails in any action shall be entitled to an award of reasonable attorney's fees and costs."

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request a judicial declaration and judgment as follows:

A.   Class Certification:

1. That this action be certified as a class action with respect to the relevant causes of action;

2. That Plaintiffs be appointed as the representatives of the respective

classes; and

   3.  That counsel for Plaintiffs be appointed as class counsel.

B.   A declaration that:

   1.  the restraints of trade in Skyline's Employment Agreement, including without limitation the confidentiality restrictions and the non-solicitation covenants are void and unenforceable;

   2.  Skyline's former employees, including without limitation Stahl, Loy, and the other members of the putative class, may accept employment with Stahl, Loy or their entity and/or continue to work in their chosen business or profession and sell products/services that are competitive with Skyline;

   3.  Plaintiffs have not violated any contractual, statutory or common law duty or obligation owed to Skyline in relation to the Employment Agreement; and

   4.  Skyline is obligated to comply with Business and Professions Code sections 16600 and 17200 and may not evade California's sovereign authority to regulate trade in California by seeking to enforce unlawful provisions of the Employment Agreement;

   5.  Skyline's conduct of not reimbursing employees in violation of Labor Code section 2802 is a violation of Business and Professions Code section 17200.

C.   A preliminary and permanent injunction as necessary and appropriate to effectuate the declaratory judgment and prevent the subject unfair competition.

D.   A preliminary and permanent injunction against Skyline including their officers, agents, servants, employees and attorneys, and those in active participation with them, restraining and enjoining them from:

   1.  enforcing any post-termination restrictive covenants against Skyline's

former employees, including without limitation Stahl, Loy and the other members of the putative class, or to otherwise restrain them from working in their chosen business or professions;

2. interfering with Stahl, Loy and K.D. Stahl's right to hire any former Skyline employees who executed an Employment Agreement on the grounds that said individual violated any post-termination restrictive covenant, obligation of confidentiality, law of unfair competition, or any other law regarding restraint of trade;

3. restricting competition or employment on the ground that any former employee is in possession of confidential information belonging to Skyline and that such former employee would "inevitably" use or disclose such information in the course of such competition.

4. Not reimbursing employees for necessary business expenses.

E.   A judgment awarding Plaintiffs' actual, consequential and incidental losses and damages in an amount to be determined at trial.

F.   A judgment awarding Plaintiffs punitive damages in an amount sufficient to make an example of and to punish Skyline.

G.   A judgment for three times the damages sustained by Plaintiffs pursuant to law, including but not limited to Business and Professions Code section 16750 and section 4 of the Clayton Act, 15 U.S.C. § 15.

H.   For all civil penalties pursuant to California Labor Code §§ 2699, *et seq.*, and all other applicable Labor Code provisions.

I.   A judgment awarding Plaintiffs their attorney's fees, costs, and disbursements as permitted by law.

/ / /

/ / /

J.    A judgment awarding Plaintiffs such other and further relief as this Court deems just and proper.

DATED: April 15, 2022         PROCOPIO, CORY, HARGREAVES SAVITCH LLP

By:     /s/Tyler M. Paetkau
        Tyler M. Paetkau
        Nicholas Kawuka

        Attorneys for Plaintiffs Kraig Stahl and
        Gregory Loy, on behalf of themselves and all
        of those similarly situated,
        and K.D. Stahl Construction Group, Inc.

# Exhibit 1

# EXECUTIVE EMPLOYMENT AGREEMENT

This Executive Employment Agreement (the "**Agreement**") is made and entered into effective as of November 30, 2020 (the "**Effective Date**") by and between Skyline Capital Builders LLC, a California limited liability company (the "**Company**"), and Kraig Stahl ("**Executive**"), a resident of the State of Texas. The Company and Executive are hereinafter collectively referred to as the "**Parties**," and individually referred to as a "**Party**."

## RECITALS

A.    The Company intends to open an office in San Diego, California, and hire Executive as the Company's Project Executive, to operate out of the Company's San Diego office.

B.    The Company and Executive desire to enter into this Agreement pursuant to the following terms and conditions.

## AGREEMENT

**NOW**, **THEREFORE**, in consideration of the mutual promises and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **Employment**.

(a)    The Company hereby agrees to employ Executive, and Executive hereby accepts employment by the Company, upon the terms and conditions set forth in this Agreement on an "at-will" basis, meaning that Executive's employment can be terminated at any time, with or without notice and with or without cause, for any reason or for no reason, by either the Company or Executive.

(b)    Executive shall serve as Project Executive of the Company, reporting directly to Sean Holliday, President or his successor, and shall be expected to perform the normal duties, responsibilities and authority of such office commensurate with the duties, authorities and responsibilities of persons in similar capacities in similarly sized California companies. Executive shall do and perform all services, acts, or responsibilities necessary or advisable to carry out the duties of the Company as assigned by the Company; provided, however, that at all times during his employment, Executive shall be subject to the direction and policies established from time to time by the Company's Board of Directors (the "**Board**").

(c)    The Company's normal business hours are from 8:00 a.m. to 5:00 p.m., Monday through Friday. The Company may change your responsibilities and duties and your work location from time-to-time as it deems necessary.

DocuSign Envelope ID: B32A0449-1A93-4537-A9FE-EA965BE18288

2. **Loyal and Conscientious Performance**.  During his employment with the Company, Executive shall devote sufficient energy, abilities and productive time to the proper and efficient performance of this Agreement, including properly carrying out the duties of a Project Executive.  The preceding is not intended to prohibit Executive from engaging in charitable or nonprofessional activities such as personal investments as long as they do not conflict with Executive's duties to the Company.  Further, Executive shall not bring any materials, assets, trade secrets, or other confidential information over from the companies he previously operated at or violate any obligations Executive may have to any former employer.  Executive acknowledges and agrees that the Company shall not assume any debts, obligations, or other responsibilities Executive may owe to those former companies or other third parties arising from Executive's connections to those former companies.

3. **Compensation**.

(a) **Base Salary**.  The Company shall pay Executive an annual gross base salary in the amount of $200,000 (the "**Base Salary**"), payable in accordance with the Company's normal payroll practices.

(b) **Annual Bonus**.  In addition to the Base Salary, Executive shall be eligible to participate in the Company's annual discretionary bonus program (the "**Annual Bonus**").  The Annual Bonus shall be subject to legal and regulatory requirements, and will be based upon a calendar year.  Such Bonus will be pro-rated based on Executive's start date.  Executive must be employed on the Annual Bonus payment date, to be determined by the Company, in order to be eligible to receive the Bonus payment.

(c) **Incentive Bonus.**  In addition to the Base Salary, and eligibility to participate in the Company's annual discretionary bonus program, for the first 5 years of Executive employment with the Company, the Company shall pay Executive an annual incentive bonus of 15% of net income in excess of the Company's business plan for that particular year.

(d) **Synthetic Equity.**  Executive shall also be eligible to participate in the Company's synthetic equity program.  All terms of this program are governed by the plan documents, and the grant is subject to the approval of the Board (in its sole discretion) and the performance of the Executive and the Company.

(e) **Transportation.**  Executive shall be provided with an Auto Allowance of $1,000 per month (gross, paid the last week of each month) and a gas card (for business-related travel, and use consistent with Company policy).

(f) **Additional Benefits**. Executive shall also be entitled to the following benefits:

(i) Medical, dental and vision insurance coverage, and disability programs and life insurance (all effective on the first day of the month following the date of hire) and other employee benefits (e.g., ESOP Plan, 401(k) Plan, Profit Sharing) established by the Company from time to time for similarly situated executive officers of the Company and its affiliates, subject to legal and regulatory requirements, provided, however, that participation shall be governed in all respects by the terms of the applicable benefit plan documents.

(ii)     During Executive's employment with the Company, Executive shall be entitled to paid vacation time in accordance with the Company's normal and customary policies and procedures now in force or as such policies and procedures may be modified.

(iii)    The Company shall reimburse Executive for all reasonable out-of-pocket expenses incurred by him in the course of performing his duties under this Agreement, which are consistent with the Company's policies in effect from time to time with respect to travel, entertainment and other business expenses, subject to the Company's requirements with respect to approval, reporting and documentation of such expenses pursuant to Company policy. Notwithstanding the foregoing, Executive shall be reimbursed up to $7,500 for travel-related costs between California and Texas during the Executive's first (1st) year of employment (submitted on Company expense reports and approved by the Company's President).

(g)     **Withholding and Taxes**.  All of Executive's compensation (including the Auto Allowance) shall be subject to customary federal and state withholding taxes and any other employment taxes as are commonly required to be collected or withheld by the Company.

4.     **Trade Secrets, Confidentiality, Invention Assignment, and Other Covenants**.

(a)     **Trade Secrets in General**.  During the course of Executive's employment, Executive has had access to and will have access to various trade secrets, confidential information and inventions of the Company as defined below.

(i)     "**Confidential Information**" means all information and material which is proprietary to the Company or any former, present, or future parent, subsidiary, affiliate, successor, or assign of Company, whether or not marked as "confidential" or "proprietary" and which is disclosed to or obtained from the Company by Executive or developed, created, or discovered by Executive, which relates to the Company's past, present or future business activities. Confidential Information is all information or materials prepared by or for the Company which information or materials has commercial value in the business in which the Company is engaged and includes, without limitation, all of the following:  designs, drawings, specifications, techniques, models, data, source code, object code, documentation, diagrams, flow charts, research, development, processes, systems, methods, machinery, procedures, "know-how", new construction designs, products, construction operation techniques, or new technology information, formulas, patents, patent applications, product prototypes, product copies, copyrights, possible transactions with other companies, actual or potential mergers and acquisitions, equity issuances, cost of production, manufacturing, developing or marketing techniques and materials, cost of production, development or marketing time tables, customer lists, strategies related to customers, suppliers or personnel, contract forms, pricing policies and financial information, volumes of sales, and other information of similar nature, whether or not reduced to writing or other tangible form, and any other Trade Secrets, as defined by subsection (iii), or non-public business information. Confidential Information does not include any information which (1) is or becomes generally available to the public by acts other than those of Executive (or anyone acting on his behalf) after receiving it, (2) becomes generally available to the public by acts of Executive necessary to performing duties associated with their job description, or (3) has been received lawfully and in good faith by Executive from a third party who did not derive it from the Company.

3

DocuSign Envelope ID: B33A0449-1A93-4537-A9EE-EA865BE16288

(ii)    "**Inventions**" means all discoveries, concepts and ideas, whether patentable or not, including but not limited to, processes, methods, formulas, compositions, techniques, articles and machines, as well as improvements and derivative works thereof or "know-how" related thereto, relating at the time of conception or reduction to practice to the business engaged in by the Company, or any actual or anticipated research or development by the Company. Inventions do not include any idea or invention which is developed entirely on Executive's own time without using the Company's equipment, supplies, facilities, or Trade Secret information, and which is not related to the Company's business, or actual or demonstrably anticipated research or development of the Company, and which does not result from any work performed by Executive for the Company.

(iii)    "**Trade Secrets**" shall mean any scientific, technical, or other data, information, design, process, procedure, formula or improvement that is commercially available to the Company, that is not generally known in the industry, and that derives independent economic value, actual or potential, from not being generally known to or readily ascertainable through appropriate means by other persons who might obtain economic value from its disclosure or use.

This Section includes not only information belonging to the Company which existed before the date of this Agreement, but also information developed by Executive for the Company or its employees during his employment and thereafter.

(b)    **Restriction on Use of Confidential Information**.  To the fullest extent permitted by law, Executive agrees that his use of Trade Secrets and other Confidential Information is subject to the following restrictions during the term of the Agreement and for an indefinite period thereafter so long as the Trade Secrets and other Confidential Information have not become generally known to the public.

(i) **Non-Disclosure**.  Except as required by the performance of Executive's services to the Company under the terms of this Agreement, neither Executive nor any of his agents or representatives, shall, directly or indirectly, publish or otherwise disclose, or permit others to publish, divulge, disseminate, copy or otherwise disclose the Company's Trade Secrets, Confidential Information and/or Inventions during or after the term of this Agreement.

(ii) **Use Restriction**.  Executive shall use the Trade Secrets, other Confidential Information and/or Inventions only for the limited purpose for which they were disclosed.  Executive shall not disclose the Trade Secrets, other Confidential Information and/or Inventions to any third party without first obtaining written consent from the Board and shall disclose the Trade Secrets, other Confidential Information and/or Inventions only to the Company's own employees having a need to know.  Executive shall promptly notify the Board of any items of Trade Secrets prematurely disclosed.

(iii) **Surrender Upon Termination**.  Upon termination of his employment with the Company for any reason, Executive will surrender and return to the Company all documents and materials in his possession or control which contain Trade Secrets, Inventions and other Confidential Information.  Executive shall immediately return to the Company all lists, books, records, materials and documents, together with all copies thereof, and all other Company property in his possession or under his control, relating to or used in connection with the past,

4

DocuSign Envelope ID: B32A0449-1A98-4587-A9EE-EA865BE18288

present or anticipated business of the Company, or any affiliate or subsidiary thereof. Executive acknowledges and agrees that all such lists, books, records, materials and documents, are the sole and exclusive property of the Company.

(c)     Nothing in this Section 4(b) or otherwise in this Agreement shall limit or restrict in any way Executive's immunity from liability for disclosing the Company's trade secrets as specifically permitted by 18 U.S. Code Section 1833, the pertinent provisions of which are attached hereto as **Exhibit A**.

(d)     **Prohibition Against Unfair Competition**.    During the period of Executive's employment, Executive will at all times devote Executive's best efforts to the interests of the Company, and Executive will not, without the prior written consent of the Company, engage in, or encourage or assist others to engage in, any other employment or activity that: (i) would divert from the Company any business opportunity in which the Company can reasonably be expected to have an interest; (ii) would directly compete with, or involve preparation to compete with, the current or future business of the Company; or (iii) would otherwise conflict with the Company's interests or could cause a disruption of its operations or prospects. Further, at any time after the termination of his employment with the Company for any reason, Executive will not engage in competition with the Company while making use of the Trade Secrets of the Company.

(e)     **Disclosure of Inventions.**  Executive will promptly disclose in confidence to the Company, or to any person designated by it, all Inventions that Executive makes, creates, conceives or first reduces to practice, either alone or jointly with others, during the period of Executive's employment, whether or not in the course of Executive's employment, and whether or not patentable, copyrightable or protectable as trade secrets.

(f)     **Work for Hire; Assigned Inventions.**  Executive acknowledges and agrees that any copyrightable works prepared by Executive within the scope of Executive's employment will be "works made for hire" under the Copyright Act and that the Company will be considered the author and owner of such copyrightable works. Executive agrees that all Inventions that Executive makes, creates, conceives or first reduces to practice during the period of Executive's employment, whether or not in the course of Executive's employment, and whether or not patentable, copyrightable or protectable as trade secrets, and that (i) are developed using equipment, supplies, facilities or trade secrets of the Company; (ii) result from work performed by Executive for the Company; or (iii) relate to the Company's business or actual or demonstrably anticipated research or development (the "**Assigned Inventions**"), will be the sole and exclusive property of the Company.

(g)     **Excluded Inventions and Other Inventions.** Attached hereto as **Exhibit B** is a list describing all existing Inventions, if any, that may relate to the Company's business or actual or demonstrably anticipated research or development and that were made by Executive or acquired by Executive prior to the Effective Date, and which are not to be assigned to the Company ("**Excluded Inventions**").  If no such list is attached, Executive represents and agrees that it is because Executive has no rights in any existing Inventions that may relate to the Company's business or actual or demonstrably anticipated research or development.  For purposes of this Agreement, "**Other Inventions**" means Inventions in which Executive has or may have an interest, as of the Effective Date or thereafter, other than Assigned Inventions and Excluded Inventions.

DocuSign Envelope ID: B32A0449-1A93-4587-A9EE-EA865BE18288

Executive acknowledges and agrees that if, in the scope of Executive's employment, Executive uses any Excluded Inventions or any Other Inventions or if Executive includes any Excluded Inventions or Other Inventions in any product or service of the Company or if Executive's rights in any Excluded Inventions or Other Inventions may block or interfere with, or may otherwise be required for, the exercise by the Company of any rights assigned to the Company under this Agreement, Executive will immediately so notify the Company in writing.  Unless the Company and Executive agree otherwise in writing as to particular Excluded Inventions or Other Inventions, Executive hereby grants to the Company, in such circumstances (whether or not Executive gives the Company notice as required above), a perpetual, irrevocable, nonexclusive, transferable, world-wide, royalty-free license to use, disclose, make, sell, offer for sale, import, copy, distribute, modify and create works based on, perform, and display such Excluded Inventions and Other Inventions, and to sublicense third parties in one or more tiers of sublicensees with the same rights.

(h)   **Exception to Assignment**.  Executive understands that the Assigned Inventions will not include, and the provisions of this Agreement requiring assignment of inventions to the Company do not apply to, any invention that qualifies fully for exclusion under the provisions of California State law attached hereto as **Exhibit C**.

(i)   **Assignment of Rights**.  Executive agrees to assign, and do hereby irrevocably transfers and assigns, to the Company:  (i) all of Executive's rights, title and interests in and with respect to any Assigned Inventions; (ii) all patents, patent applications, copyrights, mask works, rights in databases, trade secrets, and other intellectual property rights, worldwide, in any Assigned Inventions, along with any registrations of or applications to register such rights; and (iii) to the extent assignable, any and all Moral Rights (as defined below) that Executive may have in or with respect to any Assigned Inventions.  Executive also hereby forever waives and agrees never to assert any Moral Rights Executive may have in or with respect to any Assigned Inventions and any Excluded Inventions or Other Inventions licensed to the Company under Section 4, even after termination of Executive's employment with the Company.  "**Moral Rights**" means any rights to claim authorship of a work, to object to or prevent the modification or destruction of a work, to withdraw from circulation or control the publication or distribution of a work, and any similar right, regardless of whether or not such right is denominated or generally referred to as a "moral right."

(j)   **Assistance**.  Executive will assist the Company in every proper way to obtain and enforce for the Company all patents, copyrights, mask work rights, trade secret rights and other legal protections for the Assigned Inventions, worldwide.  Executive will execute and deliver any documents that the Company may reasonably request from Executive in connection with providing such assistance.  Executive's obligations under this section will continue beyond the termination of Executive's employment with the Company; provided that the Company agrees to compensate Executive at a reasonable rate after such termination for time and expenses actually spent by Executive at the Company's request in providing such assistance.  Executive hereby appoints the Secretary of the Company as his attorney-in-fact to execute documents on Executive's behalf for this purpose.  Executive agrees that this appointment is coupled with an interest and will not be revocable.

(k)     **Government Agency Exception.**   Nothing in this Agreement precludes Executive from filing a charge or complaint with, or participating in any investigation or proceeding before, or reporting possible violations to, the Equal Employment Opportunity Commission ("EEOC"), the National Labor Relations Board ("NLRB"), the Occupational Safety and Health Administration ("OSHA"), the Securities and Exchange Commission ("SEC"), or any other federal, state or local governmental agency or commission ("Government Agencies").  Executive further understands that this Agreement does not limit Executive's ability to communicate with the Government Agencies or otherwise participate in any investigation or proceeding that may be conducted by any Government Agency, including providing documents or other information, without notice to the Company, or prohibit Executive from participating in activities that are protected under whistleblower provisions of federal law or regulation.  This Agreement does not limit Executive's right to receive an award for information provided to the SEC under SEC Rule 21F-17.

(l)     **Cooperation**.  Following the termination of Executive's employment for any reason, Executive will cooperate fully with the Company and with the Company's counsel in connection with any present and future actual or threatened litigation, administrative proceeding or other investigation involving the Company that relates to events, occurrences or conduct occurring (or claimed to have occurred) during the term of Executive's employment with the Company.  Expenses incurred by Executive, as related to any such requirement, will be reimbursed to Executive by the Company.

(m)     **Non-Disparagement; Social Media**.  Executive will not criticize, defame, be derogatory toward or otherwise disparage the Company, its products, services, or the Company's past, present and future officers, directors, managers, stockholders, members, attorneys, agents, representatives, employees, or affiliates, or its or their business plans or actions, to any third party, either orally or in writing; provided, however, that this provision will not preclude Executive from disclosing information about unlawful acts in the workplace, including, but not limited to, sexual harassment or giving truthful testimony in response to a lawful subpoena or preclude any conduct protected under any state or federal law providing "whistleblower" protection to Executive. In addition, on the date of Executive's termination of employment, Executive shall update his profile on social media websites (such as LinkedIn) to reflect that he is no longer an employee of the Company.

(n)     **Non-Solicitation of Employees/Consultants**.  During Executive's employment with the Company and for a one (1) year period thereafter, Executive will not directly or indirectly solicit away employees or consultants of the Company for Executive's own benefit or for the benefit of any other person or entity, nor will Executive encourage or assist others to do so.

(o)     **Use of Name & Likeness**.  Executive hereby authorizes the Company to use, reuse, and to grant others the right to use and reuse, Executive's name, photograph, likeness (including caricature), voice, and biographical information, and any reproduction or simulation thereof, in any form of media or technology now known or hereafter developed, both during and after Executive's employment, for any purposes related to the Company's business, such as marketing, advertising, credits, and presentations.

7

(p)     **Survival**.  This Section 4 survives the termination of this Agreement.

5.     **Miscellaneous**.

(a)     **Authorization to Work.**  Please note that because of employer regulations adopted in the Immigration Reform and Control Act of 1986, within three (3) business days of starting your new position you will need to present documentation demonstrating that you have authorization to work in the United States.  If you have questions about this requirement, which applies to U.S. citizens and non-U.S. citizens alike, you may contact our personnel office.

(b)     **Background Check**.  This offer of employment is contingent upon a satisfactory verification of criminal, education, driving and/or employment background.  This offer can be rescinded based upon data received in the verification.

(c)     **Assignment and Binding Effect**.  This Agreement shall be binding upon and inure to the benefit of Executive and Executive's heirs, executors, administrators, estate, beneficiaries, and legal representatives.  Neither this Agreement nor any rights or obligations under this Agreement shall be assignable by either party without the prior express written consent of the other party.  This Agreement shall be binding upon and inure to the benefit of the Company and its successors, assigns and legal representatives.

(d)     **Notices**.  All notices or demands of any kind required or permitted to be given by the Company or Executive under this Agreement shall be given in writing and shall be personally delivered (and receipted for), or sent by recognized commercial overnight courier, or mailed by certified mail, return receipt requested, postage prepaid, addressed as follows:

If to the Company:

Skyline Capital Builders LLC
100 Pringle Avenue, Suite 330
Walnut Creek, CA 94596
Email: sholliday@skylinecapitalbuilders.com
Attention: Sean Holliday, President

If to Executive:

7418 Reed Drive,
Volente TX 78641
Email: coachkraig@yahoo.com

Or at the then-current address on file with the Company.

Any such written notice shall be deemed received when personally delivered or upon receipt in the event of overnight courier, or three (3) days after its deposit in the United States mail by certified mail as specified above.  Either Party may change its address for notices by giving notice to the other Party in the manner specified in this Section.

(e) **Choice of Law; Arbitration**. This Agreement shall be construed and interpreted in accordance with the internal laws of the State of California. The Parties agree that any controversy or claim arising out or relating to this Agreement, or the breach hereof, or arising out of or relating to the employment of Executive and/or the rights, duties or obligations of the Company or of Executive shall be settled by binding arbitration in accordance with the Arbitration Agreement in the form and substance attached as **Exhibit D** and incorporated by this reference as though fully set forth herein.

(f) **Integration**. This Agreement (including Exhibits A-D) contains the entire agreement of the parties relating to the subject matter of this Agreement, and supersedes all prior oral and written employment agreements or arrangements between the Parties, including the Prior Agreement; provided, that except as otherwise expressly stated in this Agreement, incentive awards granted to Executive shall be governed by the relevant plan and any other related grant or award agreement and any other related documents. This Agreement cannot be amended or modified except by a written agreement signed by Executive and a duly authorized representative of the Company.

(g) **Waiver**. No term, covenant or condition of this Agreement or any breach thereof shall be deemed waived, except with the written consent of the Party against whom the waiver is claimed, and any waiver of any such term, covenant, condition or breach shall not be deemed to be a waiver of any preceding or succeeding breach of the same or any other term, covenant, condition or breach. No failure to exercise, delay in exercising, or single or partial exercise of any right, power or remedy by either party hereto shall constitute a waiver thereof or shall preclude any other or further exercise of the same or any other right, power or remedy.

(h) **Severability**. The unenforceability, invalidity, or illegality of any provision of this Agreement shall not render any other provision of this Agreement unenforceable, invalid or illegal.

(i) **Interpretation; Construction**. The headings set forth in this Agreement are for convenience only and shall not be used in interpreting this Agreement. The Parties acknowledge that each Party and its counsel have reviewed and revised, or had an opportunity to review and revise, this Agreement, and the normal rule of construction to the effect any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

(j) **Injunctive Relief**. In the event that Executive breaches any restrictive covenant, the Company shall be entitled to an injunction restraining Executive from violating such restrictive covenant (without posting any bond or other security). If the Company institutes any action or proceeding to enforce any such restrictive covenant, Executive hereby waives the claim or defense that the Company has an adequate remedy at law and agrees not to assert in any such action or proceeding the claim or defense that the Company has an adequate remedy at law.

(k) **Attorneys' Fees**. In any controversy or claim arising out of or relating to this Agreement or the breach thereof, which results in legal action, proceeding or arbitration, the prevailing party in such action, as determined by the court or arbitrator, shall be entitled to recover reasonable attorneys' fees and costs incurred in such action.

DocuSign Envelope ID: B32A0449-1AB3-4537-A9EE-EA865BE48288

(l)     **Counterparts; Facsimile**.  This Agreement may be executed and delivered (including by facsimile, .pdf or similar electronic transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement

(m)     **Representations and Warranties**.  Executive represents and warrants that he is not restricted or prohibited, contractually or otherwise, from entering into and performing each of the terms and covenants contained in this Agreement, and that his execution and performance of this Agreement will not violate or breach any other agreement between Executive and any other person or entity.  Executive affirms that he has no agreement with any other party that would preclude his (her) compliance with any obligations under this Agreement.

(n)     **Preservation of Property**.  Executive will exercise reasonable care, consistent with good business judgment to preserve in good working order, subject to reasonable wear and tear from authorized usage, and to prevent loss of, any equipment, instruments or accessories of the Company in his custody for the purpose of conducting the business of the Company.  Upon request, Executive will promptly surrender the same to the Company at the conclusion of his employment, or if not surrendered, Executive will account to the Company to its reasonable satisfaction as to the present location of all such instruments or accessories and the business purpose for their placement at such location.   At the conclusion of Executive's employment with the Company, he agrees to return such instruments or accessories to the Company or to account for same to the Company's reasonable satisfaction.

*(Signature page follows)*

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the Effective Date.

Skyline Capital Builders LLC, a California limited liability company

EXECUTIVE:

By: _Sean Holliday_
Name: Sean Holliday
Title: President

By: _Kraig Stahl_
Name: Kraig Stahl
Title: Project Executive

11

# EXHIBIT A

## DEFEND TRADE SECRETS ACT, 18 U.S. CODE § 1833 NOTICE:

18 U.S. Code Section 1833 provides as follows:

**Immunity From Liability For Confidential Disclosure Of A Trade Secret To The Government Or In A Court Filing.** An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made, (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

**Use of Trade Secret Information in Anti-Retaliation Lawsuit.** An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual (A) files any document containing the trade secret under seal; and (B) does not disclose the trade secret, except pursuant to court order.

# EXHIBIT B

## LIST OF EXCLUDED INVENTIONS UNDER SECTION 4

<u>Title</u>

<u>Date</u>

Identifying Number
or Brief Description

Na

Na

Na

X
_____   No inventions, improvements, or original works of authorship

Na
_____   Additional sheets attached

Signature of Executive: _____

Print Name of Executive: _____
Kraig Stahl

Date: _____
10/27/2020

13

## EXHIBIT C

## CALIFORNIA LABOR CODE 2870 NOTICE:

California Labor Code Section 2870 provides as follows:

Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either: (1) relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (2) result from any work performed by the employee for the employer. To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under California Labor Code Section 2870(a), the provision is against the public policy of this state and is unenforceable.

DocuSign Envelope ID: B32A0449-1AB3-4587-A9EE-EA065BE48288

# EXHIBIT D

# EXECUTIVE ARBITRATION AGREEMENT

THIS ARBITRATION AGREEMENT ("**Agreement**") is made by and between Skyline Capital Builders LLC, a California limited liability company ("**Company**") and Kraig Stahl ("**Executive**").

The purpose of this Agreement is to establish final and binding arbitration for all disputes arising out of Executive's relationship with Company, including without limitation Executive's employment or the termination of Executive's employment.  Executive and Company desire to arbitrate their disputes on the terms and conditions set forth below to gain the benefits of a speedy, impartial dispute-resolution procedure.  Executive and Company agree to the following:

1.  <u>Claims Covered by the Agreement</u>.  To the fullest extent permitted by law, and subject to the limitations on arbitration set forth in subpart (a) below, Executive and the Company (collectively, the "**parties**") agree as follows:

(a)  The parties agree to submit to mandatory binding arbitration any and all claims arising out of or related to Executive's employment with the Company and the termination thereof (the "**Arbitrable Claims**"), except as follows:  This arbitration section does not restrict Executive's right to file (A) claims in court for violation of the California Labor Code, including on a representative action basis under California Labor Code Sections 2698, *et seq*., or the California Fair Employment and Housing Act; or (B) administrative claims before any government agency where, as a matter of law, Executive has the right to file such administrative claims (including, but not limited to, the National Labor Relations Board, the Equal Employment Opportunity Commission, the Department of Labor, and applicable state and local agencies, including the California Department of Fair Employment and Housing).

(b)  This arbitration section is governed by and will be construed in accordance with the Federal Arbitration Act, 9 U.S.C. 1, *et seq*.

2.  <u>Required Notice of Claims and Statute of Limitations</u>.  For all (i) Arbitrable Claims, and (ii) claims covered by paragraph 1(a) above that Executive voluntarily elects to adjudicate through arbitration rather than in court, Executive may initiate arbitration by serving or mailing a written notice to the Company's Board of Directors.  Company may initiate arbitration by serving or mailing a written notice to Executive at the last address recorded in Executive's personnel file.  The written notice must specify the claims asserted against the other party.  Notice of any claim sought to be arbitrated must be served within the limitations period established by applicable federal or state law.

3. <u>Arbitration Procedures</u>.

a. After demand for arbitration has been made by serving written notice under the terms of paragraph 2 of this Agreement, the party demanding arbitration shall file a demand for arbitration with the American Arbitration Association ("**AAA**") in San Diego County, California

b. Except as provided herein, all rules governing the arbitration shall be the then applicable rules set forth by the AAA. If the dispute is employment-related, the dispute shall be governed by the AAA's then current version of the national rules for the resolution of employment disputes. The AAA's then applicable rules governing the arbitration may be obtained from the AAA's website which currently is www.adr.org.

c. The arbitrator shall apply the substantive law (and the law of remedies, if applicable) of the state in which the claim arose, or federal law, or both, as applicable to the claim(s) asserted. The arbitrator shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement, including but not limited to any claim that all or any part of this Agreement is void or voidable.

d. Either party may file a motion for summary judgment with the arbitrator. The arbitrator is entitled to resolve some or all of the asserted claims through such a motion. The standards to be applied by the arbitrator in ruling on a motion for summary judgment shall be the applicable laws as specified in paragraph 4(c) of this Agreement.

e. Discovery shall be allowed and conducted pursuant to the then applicable arbitration rules of the AAA. The arbitrator is authorized to rule on discovery motions brought under the applicable discovery rules.

4. <u>Application for Emergency Injunctive and/or Other Equitable Relief</u>. Claims by Company or Executive for emergency injunctive and/or other equitable relief relating to unfair competition and/or the use and/or unauthorized disclosure of trade secrets or confidential information shall be subject to the then current version of the AAA's Optional Rules for Emergency Measures of Protection set forth within the AAA's Commercial Dispute Resolution Procedures. The AAA shall appoint a single emergency arbitrator to handle the claim(s) for emergency relief. The emergency arbitrator selected by the AAA shall be either a retired judge or an individual experienced in handling matters involving claims for emergency injunctive and/or other equitable relief relating to unfair competition and the use or unauthorized disclosure of trade secrets and/or confidential information.

5. <u>Arbitration Decision</u>. The arbitrator's decision will be final and binding. The arbitrator shall issue a written arbitration decision revealing the essential findings and conclusions upon which the decision and/or award is based. A party's right to appeal the decision is limited to grounds provided under applicable federal or state law.

6. <u>Place of Arbitration</u>. The arbitration will be at a mutually convenient location that must be within 50 miles of Executive's last company employment location. If the

DocuSign Envelope ID: B32A0449-1A83-4587-A9EE-EA965BE18288

parties cannot agree upon a location, then the arbitration will be held at the AAA's office nearest to Executive's last employment location.

7. <u>Construction</u>. Should any portion of this Agreement be found to be unenforceable, such portion will be severed from this Agreement, and the remaining portions shall continue to be enforceable.

8. <u>Representation, Fees and Costs</u>. Each party may be represented by an attorney or other representative selected by the party. Except as otherwise provided for by statute, the arbitrator shall award reasonable attorneys' fees and costs (including without limitation, costs for depositions, experts, etc.) to Executive provided Executive is the prevailing party except that Company shall be responsible for the arbitrator's fees and costs, or any fees or costs charged by the AAA, to the extent they exceed any fee or cost that Executive would be required to bear if the action were brought in court. Unless permitted by applicable law, Executive shall not be responsible for attorneys' fees and costs of Company.

9. <u>Waiver of Jury Trial/Exclusive Remedy</u>. SUBJECT TO THE LIMITATIONS SET FORTH IN PARAGRAPH 1(A), EXECUTIVE AND COMPANY KNOWINGLY AND VOLUNTARILY WAIVE ANY CONSTITUTIONAL RIGHT TO HAVE ANY ARBITRABLE CLAIMS BETWEEN THEM DECIDED BY A COURT OF LAW AND/OR BY A JURY IN COURT.

10. <u>Sole and Entire Agreement</u>. This Agreement expresses the entire Agreement of the parties and shall supersede any and all other agreements, oral or written, concerning arbitration. This Agreement is not, and shall not be construed to create, any contract of employment, express or implied.

11. <u>Requirements for Modification or Revocation</u>. This Agreement to arbitrate shall survive the termination of Executive's employment. It can only be revoked or modified by a writing signed by the President of the Company and Executive that specifically states an intent to revoke or modify this Agreement.

12. <u>Voluntary Agreement</u>. EXECUTIVE ACKNOWLEDGES THAT EXECUTIVE HAS CAREFULLY READ THIS AGREEMENT, UNDERSTANDS ITS TERMS, AND AGREES THAT ALL UNDERSTANDINGS AND AGREEMENTS BETWEEN COMPANY AND EXECUTIVE RELATING TO THE SUBJECTS COVERED IN THE AGREEMENT ARE CONTAINED IN IT. EXECUTIVE HAS KNOWINGLY AND VOLUNTARILY ENTERED INTO THE AGREEMENT WITHOUT RELIANCE ON ANY PROVISIONS OR REPRESENTATIONS BY COMPANY, OTHER THAN THOSE CONTAINED IN THIS AGREEMENT.

EXECUTIVE FURTHER ACKNOWLEDGES THAT EXECUTIVE HAS BEEN GIVEN THE OPPORTUNITY TO DISCUSS THIS AGREEMENT WITH EXECUTIVE'S PRIVATE LEGAL COUNSEL AND EXECUTIVE HAS UTILIZED THAT OPPORTUNITY TO THE EXTENT DESIRED.

EXECUTIVE:

By:_____

Name:_____
Kraig Stahl

Title_____
Project Executive

COMPANY:

Skyline Capital Builders LLC, a California
limited liability company

By:_____

Name:_____
Sean Holliday

Title_____
President

# Exhibit 2

# EXECUTIVE EMPLOYMENT AGREEMENT

This Executive Employment Agreement (the "**Agreement**") is made and entered into effective as of November 30, 2020 (the "**Effective Date**") by and between Skyline Capital Builders LLC, a California limited liability company (the "**Company**"), and Greg Loy ("**Executive**"), a resident of the State of California.  The Company and Executive are hereinafter collectively referred to as the "**Parties**," and individually referred to as a "**Party**."

## RECITALS

A.    The Company intends to open an office in San Diego, California, and hire Executive as the Company's Director of Preconstruction and Estimating, to operate out of the Company's San Diego office.

B.    The Company and Executive desire to enter into this Agreement pursuant to the following terms and conditions.

## AGREEMENT

**NOW**, **THEREFORE**, in consideration of the mutual promises and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **Employment**.

(a)    The Company hereby agrees to employ Executive, and Executive hereby accepts employment by the Company, upon the terms and conditions set forth in this Agreement on an "at-will" basis, meaning that Executive's employment can be terminated at any time, with or without notice and with or without cause, for any reason or for no reason, by either the Company or Executive.

(b)    Executive shall serve as Director of Preconstruction and Estimating of the Company, reporting directly to Sean Holliday, President or his successor, and shall be expected to perform the normal duties, responsibilities and authority of such office commensurate with the duties, authorities and responsibilities of persons in similar capacities in similarly sized California companies.  Executive shall do and perform all services, acts, or responsibilities necessary or advisable to carry out the duties of the Company as assigned by the Company; provided, however, that at all times during his employment, Executive shall be subject to the direction and policies established from time to time by the Company's Board of Directors (the "**Board**").

(c)    The Company's normal business hours are from 8:00 a.m. to 5:00 p.m., Monday through Friday.  The Company may change your responsibilities and duties and your work location from time-to-time as it deems necessary.

2. **Loyal and Conscientious Performance**.   During his employment with the Company, Executive shall devote sufficient energy, abilities and productive time to the proper and efficient performance of this Agreement, including properly carrying out the duties of a Director of Preconstruction and Estimating.   The preceding is not intended to prohibit Executive from engaging in charitable or nonprofessional activities such as personal investments as long as they do not conflict with Executive's duties to the Company.   Further, Executive shall not bring any materials, assets, trade secrets, or other confidential information over from the companies he previously operated at or violate any obligations Executive may have to any former employer. Executive acknowledges and agrees that the Company shall not assume any debts, obligations, or other responsibilities Executive may owe to those former companies or other third parties arising from Executive's connections to those former companies.

3. **Compensation**.

(a) **Base Salary**.  The Company shall pay Executive an annual gross base salary in the amount of $200,000 (the "**Base Salary**"), payable in accordance with the Company's normal payroll practices.

(b) **Annual Bonus**.  In addition to the Base Salary, Executive shall be eligible to participate in the Company's annual discretionary bonus program (the "**Annual Bonus**").  The Annual Bonus shall be subject to legal and regulatory requirements, and will be based upon a calendar year.  Such Bonus will be pro-rated based on Executive's start date.  Executive must be employed on the Annual Bonus payment date, to be determined by the Company, in order to be eligible to receive the Bonus payment.

(c) **Incentive Bonus.**   In addition to the Base Salary, and eligibility to participate in the Company's annual discretionary bonus program, for the first 5 years of Executive employment with the Company, the Company shall pay Executive an annual incentive bonus of 15% of net income in excess of the Company's business plan for that particular year.

(d) **Synthetic Equity.**   Executive shall also be eligible to participate in the Company's synthetic equity program.   All terms of this program are governed by the plan documents, and the grant is subject to the approval of the Board (in its sole discretion) and the performance of the Executive and the Company.

(e) **Transportation.**   Executive shall be provided with an Auto Allowance of $1,000 per month (gross, paid the last week of each month) and a gas card (for business-related travel, and use consistent with Company policy).

(f) **Additional Benefits**. Executive shall also be entitled to the following benefits:

(i) Medical, dental and vision insurance coverage, and disability programs and life insurance (all effective on the first day of the month following the date of hire) and other employee benefits (e.g., ESOP Plan, 401(k) Plan, Profit Sharing) established by the Company from time to time for similarly situated executive officers of the Company and its affiliates, subject to legal and regulatory requirements, provided, however, that participation shall be governed in all respects by the terms of the applicable benefit plan documents.

(ii)     During Executive's employment with the Company, Executive shall be entitled to paid vacation time in accordance with the Company's normal and customary policies and procedures now in force or as such policies and procedures may be modified.

(iii)     The Company shall reimburse Executive for all reasonable out-of-pocket expenses incurred by him in the course of performing his duties under this Agreement, which are consistent with the Company's policies in effect from time to time with respect to travel, entertainment and other business expenses, subject to the Company's requirements with respect to approval, reporting and documentation of such expenses pursuant to Company policy.

(g)     **Withholding and Taxes**.  All of Executive's compensation (including the Auto Allowance) shall be subject to customary federal and state withholding taxes and any other employment taxes as are commonly required to be collected or withheld by the Company.

4.     **Trade Secrets, Confidentiality, Invention Assignment, and Other Covenants**.

(a)     **Trade Secrets in General**.  During the course of Executive's employment, Executive has had access to and will have access to various trade secrets, confidential information and inventions of the Company as defined below.

(i)     "**Confidential Information**" means all information and material which is proprietary to the Company or any former, present, or future parent, subsidiary, affiliate, successor, or assign of Company, whether or not marked as "confidential" or "proprietary" and which is disclosed to or obtained from the Company by Executive or developed, created, or discovered by Executive, which relates to the Company's past, present or future business activities. Confidential Information is all information or materials prepared by or for the Company which information or materials has commercial value in the business in which the Company is engaged and includes, without limitation, all of the following:  designs, drawings, specifications, techniques, models, data, source code, object code, documentation, diagrams, flow charts, research, development, processes, systems, methods, machinery, procedures, "know-how", new construction designs, products, construction operation techniques, or new technology information, formulas, patents, patent applications, product prototypes, product copies, copyrights, possible transactions with other companies, actual or potential mergers and acquisitions, equity issuances, cost of production, manufacturing, developing or marketing techniques and materials, cost of production, development or marketing time tables, customer lists, strategies related to customers, suppliers or personnel, contract forms, pricing policies and financial information, volumes of sales, and other information of similar nature, whether or not reduced to writing or other tangible form, and any other Trade Secrets, as defined by subsection (iii), or non-public business information. Confidential Information does not include any information which (1) is or becomes generally available to the public by acts other than those of Executive (or anyone acting on his behalf) after receiving it, (2) becomes generally available to the public by acts of Executive necessary to performing duties associated with their job description, or (3) has been received lawfully and in good faith by Executive from a third party who did not derive it from the Company.

(ii)     "**Inventions**" means all discoveries, concepts and ideas, whether patentable or not, including but not limited to, processes, methods, formulas, compositions, techniques, articles and machines, as well as improvements and derivative works thereof or "know-

DocuSign Envelope ID: 475DC136-7F46-4616-BACE-35193A124350

how" related thereto, relating at the time of conception or reduction to practice to the business engaged in by the Company, or any actual or anticipated research or development by the Company. Inventions do not include any idea or invention which is developed entirely on Executive's own time without using the Company's equipment, supplies, facilities, or Trade Secret information, and which is not related to the Company's business, or actual or demonstrably anticipated research or development of the Company, and which does not result from any work performed by Executive for the Company.

(iii)  "**Trade Secrets**" shall mean any scientific, technical, or other data, information, design, process, procedure, formula or improvement that is commercially available to the Company, that is not generally known in the industry, and that derives independent economic value, actual or potential, from not being generally known to or readily ascertainable through appropriate means by other persons who might obtain economic value from its disclosure or use.

This Section includes not only information belonging to the Company which existed before the date of this Agreement, but also information developed by Executive for the Company or its employees during his employment and thereafter.

(b)  **Restriction on Use of Confidential Information**.  To the fullest extent permitted by law, Executive agrees that his use of Trade Secrets and other Confidential Information is subject to the following restrictions during the term of the Agreement and for an indefinite period thereafter so long as the Trade Secrets and other Confidential Information have not become generally known to the public.

(i) **Non-Disclosure**.  Except as required by the performance of Executive's services to the Company under the terms of this Agreement, neither Executive nor any of his agents or representatives, shall, directly or indirectly, publish or otherwise disclose, or permit others to publish, divulge, disseminate, copy or otherwise disclose the Company's Trade Secrets, Confidential Information and/or Inventions during or after the term of this Agreement.

(ii) **Use Restriction**.  Executive shall use the Trade Secrets, other Confidential Information and/or Inventions only for the limited purpose for which they were disclosed.  Executive shall not disclose the Trade Secrets, other Confidential Information and/or Inventions to any third party without first obtaining written consent from the Board and shall disclose the Trade Secrets, other Confidential Information and/or Inventions only to the Company's own employees having a need to know.  Executive shall promptly notify the Board of any items of Trade Secrets prematurely disclosed.

(iii) **Surrender Upon Termination**.  Upon termination of his employment with the Company for any reason, Executive will surrender and return to the Company all documents and materials in his possession or control which contain Trade Secrets, Inventions and other Confidential Information.  Executive shall immediately return to the Company all lists, books, records, materials and documents, together with all copies thereof, and all other Company property in his possession or under his control, relating to or used in connection with the past, present or anticipated business of the Company, or any affiliate or subsidiary thereof.  Executive acknowledges and agrees that all such lists, books, records, materials and documents, are the sole and exclusive property of the Company.

4

DocuSign Envelope ID: 475DC136-7E46-4616-BACB-25493A124350

(c)     Nothing in this Section 4(b) or otherwise in this Agreement shall limit or restrict in any way Executive's immunity from liability for disclosing the Company's trade secrets as specifically permitted by 18 U.S. Code Section 1833, the pertinent provisions of which are attached hereto as **Exhibit A**.

(d)     **Prohibition Against Unfair Competition**.     During the period of Executive's employment, Executive will at all times devote Executive's best efforts to the interests of the Company, and Executive will not, without the prior written consent of the Company, engage in, or encourage or assist others to engage in, any other employment or activity that: (i) would divert from the Company any business opportunity in which the Company can reasonably be expected to have an interest; (ii) would directly compete with, or involve preparation to compete with, the current or future business of the Company; or (iii) would otherwise conflict with the Company's interests or could cause a disruption of its operations or prospects. Further, at any time after the termination of his employment with the Company for any reason, Executive will not engage in competition with the Company while making use of the Trade Secrets of the Company.

(e)     **Disclosure of Inventions.**  Executive will promptly disclose in confidence to the Company, or to any person designated by it, all Inventions that Executive makes, creates, conceives or first reduces to practice, either alone or jointly with others, during the period of Executive's employment, whether or not in the course of Executive's employment, and whether or not patentable, copyrightable or protectable as trade secrets.

(f)     **Work for Hire; Assigned Inventions.**  Executive acknowledges and agrees that any copyrightable works prepared by Executive within the scope of Executive's employment will be "works made for hire" under the Copyright Act and that the Company will be considered the author and owner of such copyrightable works.  Executive agrees that all Inventions that Executive makes, creates, conceives or first reduces to practice during the period of Executive's employment, whether or not in the course of Executive's employment, and whether or not patentable, copyrightable or protectable as trade secrets, and that (i) are developed using equipment, supplies, facilities or trade secrets of the Company; (ii) result from work performed by Executive for the Company; or (iii) relate to the Company's business or actual or demonstrably anticipated research or development (the "**Assigned Inventions**"), will be the sole and exclusive property of the Company.

(g)     **Excluded Inventions and Other Inventions.** Attached hereto as **Exhibit B** is a list describing all existing Inventions, if any, that may relate to the Company's business or actual or demonstrably anticipated research or development and that were made by Executive or acquired by Executive prior to the Effective Date, and which are not to be assigned to the Company ("**Excluded Inventions**").  If no such list is attached, Executive represents and agrees that it is because Executive has no rights in any existing Inventions that may relate to the Company's business or actual or demonstrably anticipated research or development.  For purposes of this Agreement, "**Other Inventions**" means Inventions in which Executive has or may have an interest, as of the Effective Date or thereafter, other than Assigned Inventions and Excluded Inventions. Executive acknowledges and agrees that if, in the scope of Executive's employment, Executive uses any Excluded Inventions or any Other Inventions or if Executive includes any Excluded Inventions or Other Inventions in any product or service of the Company or if Executive's rights in any Excluded Inventions or Other Inventions may block or interfere with, or may otherwise be

required for, the exercise by the Company of any rights assigned to the Company under this Agreement, Executive will immediately so notify the Company in writing. Unless the Company and Executive agree otherwise in writing as to particular Excluded Inventions or Other Inventions, Executive hereby grants to the Company, in such circumstances (whether or not Executive gives the Company notice as required above), a perpetual, irrevocable, nonexclusive, transferable, world-wide, royalty-free license to use, disclose, make, sell, offer for sale, import, copy, distribute, modify and create works based on, perform, and display such Excluded Inventions and Other Inventions, and to sublicense third parties in one or more tiers of sublicensees with the same rights.

(h)     **Exception to Assignment**.   Executive understands that the Assigned Inventions will not include, and the provisions of this Agreement requiring assignment of inventions to the Company do not apply to, any invention that qualifies fully for exclusion under the provisions of California State law attached hereto as **Exhibit C**.

(i)     **Assignment of Rights**.   Executive agrees to assign, and do hereby irrevocably transfers and assigns, to the Company:  (i) all of Executive's rights, title and interests in and with respect to any Assigned Inventions; (ii) all patents, patent applications, copyrights, mask works, rights in databases, trade secrets, and other intellectual property rights, worldwide, in any Assigned Inventions, along with any registrations of or applications to register such rights; and (iii) to the extent assignable, any and all Moral Rights (as defined below) that Executive may have in or with respect to any Assigned Inventions.  Executive also hereby forever waives and agrees never to assert any Moral Rights Executive may have in or with respect to any Assigned Inventions and any Excluded Inventions or Other Inventions licensed to the Company under Section 4, even after termination of Executive's employment with the Company.  "**Moral Rights**" means any rights to claim authorship of a work, to object to or prevent the modification or destruction of a work, to withdraw from circulation or control the publication or distribution of a work, and any similar right, regardless of whether or not such right is denominated or generally referred to as a "moral right."

(j)     **Assistance**.   Executive will assist the Company in every proper way to obtain and enforce for the Company all patents, copyrights, mask work rights, trade secret rights and other legal protections for the Assigned Inventions, worldwide.  Executive will execute and deliver any documents that the Company may reasonably request from Executive in connection with providing such assistance.  Executive's obligations under this section will continue beyond the termination of Executive's employment with the Company; provided that the Company agrees to compensate Executive at a reasonable rate after such termination for time and expenses actually spent by Executive at the Company's request in providing such assistance.  Executive hereby appoints the Secretary of the Company as his attorney-in-fact to execute documents on Executive's behalf for this purpose.  Executive agrees that this appointment is coupled with an interest and will not be revocable.

DocuSign Envelope ID: 475DC136-7E46-4G16-BACB-25192A124350

(k) **Government Agency Exception.** Nothing in this Agreement precludes Executive from filing a charge or complaint with, or participating in any investigation or proceeding before, or reporting possible violations to, the Equal Employment Opportunity Commission ("EEOC"), the National Labor Relations Board ("NLRB"), the Occupational Safety and Health Administration ("OSHA"), the Securities and Exchange Commission ("SEC"), or any other federal, state or local governmental agency or commission ("Government Agencies"). Executive further understands that this Agreement does not limit Executive's ability to communicate with the Government Agencies or otherwise participate in any investigation or proceeding that may be conducted by any Government Agency, including providing documents or other information, without notice to the Company, or prohibit Executive from participating in activities that are protected under whistleblower provisions of federal law or regulation. This Agreement does not limit Executive's right to receive an award for information provided to the SEC under SEC Rule 21F-17.

(l) **Cooperation.** Following the termination of Executive's employment for any reason, Executive will cooperate fully with the Company and with the Company's counsel in connection with any present and future actual or threatened litigation, administrative proceeding or other investigation involving the Company that relates to events, occurrences or conduct occurring (or claimed to have occurred) during the term of Executive's employment with the Company. Expenses incurred by Executive, as related to any such requirement, will be reimbursed to Executive by the Company.

(m) **Non-Disparagement; Social Media.** Executive will not criticize, defame, be derogatory toward or otherwise disparage the Company, its products, services, or the Company's past, present and future officers, directors, managers, stockholders, members, attorneys, agents, representatives, employees, or affiliates, or its or their business plans or actions, to any third party, either orally or in writing; provided, however, that this provision will not preclude Executive from disclosing information about unlawful acts in the workplace, including, but not limited to, sexual harassment or giving truthful testimony in response to a lawful subpoena or preclude any conduct protected under any state or federal law providing "whistleblower" protection to Executive. In addition, on the date of Executive's termination of employment, Executive shall update his profile on social media websites (such as LinkedIn) to reflect that he is no longer an employee of the Company.

(n) **Non-Solicitation of Employees/Consultants.** During Executive's employment with the Company and for a one (1) year period thereafter, Executive will not directly or indirectly solicit away employees or consultants of the Company for Executive's own benefit or for the benefit of any other person or entity, nor will Executive encourage or assist others to do so.

(o) **Use of Name & Likeness.** Executive hereby authorizes the Company to use, reuse, and to grant others the right to use and reuse, Executive's name, photograph, likeness (including caricature), voice, and biographical information, and any reproduction or simulation thereof, in any form of media or technology now known or hereafter developed, both during and after Executive's employment, for any purposes related to the Company's business, such as marketing, advertising, credits, and presentations.

7

DocuSign Envelope ID: 475DC136-7E46-4G16-BACB-25192A194350

(p)     **Survival**.  This Section 4 survives the termination of this Agreement.

5.     **Miscellaneous**.

(a)     **Authorization to Work.**  Please note that because of employer regulations adopted in the Immigration Reform and Control Act of 1986, within three (3) business days of starting your new position you will need to present documentation demonstrating that you have authorization to work in the United States.  If you have questions about this requirement, which applies to U.S. citizens and non-U.S. citizens alike, you may contact our personnel office.

(b)     **Background Check**.  This offer of employment is contingent upon a satisfactory verification of criminal, education, driving and/or employment background.  This offer can be rescinded based upon data received in the verification.

(c)     **Assignment and Binding Effect**.  This Agreement shall be binding upon and inure to the benefit of Executive and Executive's heirs, executors, administrators, estate, beneficiaries, and legal representatives.  Neither this Agreement nor any rights or obligations under this Agreement shall be assignable by either party without the prior express written consent of the other party.  This Agreement shall be binding upon and inure to the benefit of the Company and its successors, assigns and legal representatives.

(d)     **Notices**.  All notices or demands of any kind required or permitted to be given by the Company or Executive under this Agreement shall be given in writing and shall be personally delivered (and receipted for), or sent by recognized commercial overnight courier, or mailed by certified mail, return receipt requested, postage prepaid, addressed as follows:

If to the Company:

Skyline Capital Builders LLC
100 Pringle Avenue, Suite 330
Walnut Creek, CA 94596
Email: sholliday@skylinecapitalbuilders.com
Attention: Sean Holliday, President

If to Executive:

13551 Whitewater Drive

Poway Ca 92064

Email:  Kirstenloy@gmail.com


Or at the then-current address on file with the Company.

Any such written notice shall be deemed received when personally delivered or upon receipt in the event of overnight courier, or three (3) days after its deposit in the United States mail

DocuSign Envelope ID: 475DC136-7E46-4616-BACB-35188A184350

by certified mail as specified above.  Either Party may change its address for notices by giving notice to the other Party in the manner specified in this Section.

(e)  **Choice of Law; Arbitration**.  This Agreement shall be construed and interpreted in accordance with the internal laws of the State of California.  The Parties agree that any controversy or claim arising out or relating to this Agreement, or the breach hereof, or arising out of or relating to the employment of Executive and/or the rights, duties or obligations of the Company or of Executive shall be settled by binding arbitration in accordance with the Arbitration Agreement in the form and substance attached as **Exhibit D** and incorporated by this reference as though fully set forth herein.

(f)  **Integration**.  This Agreement (including Exhibits A-D) contains the entire agreement of the parties relating to the subject matter of this Agreement, and supersedes all prior oral and written employment agreements or arrangements between the Parties, including the Prior Agreement; provided, that except as otherwise expressly stated in this Agreement, incentive awards granted to Executive shall be governed by the relevant plan and any other related grant or award agreement and any other related documents.  This Agreement cannot be amended or modified except by a written agreement signed by Executive and a duly authorized representative of the Company.

(g)  **Waiver**.  No term, covenant or condition of this Agreement or any breach thereof shall be deemed waived, except with the written consent of the Party against whom the waiver is claimed, and any waiver of any such term, covenant, condition or breach shall not be deemed to be a waiver of any preceding or succeeding breach of the same or any other term, covenant, condition or breach.  No failure to exercise, delay in exercising, or single or partial exercise of any right, power or remedy by either party hereto shall constitute a waiver thereof or shall preclude any other or further exercise of the same or any other right, power or remedy.

(h)  **Severability**.  The unenforceability, invalidity, or illegality of any provision of this Agreement shall not render any other provision of this Agreement unenforceable, invalid or illegal.

(i)  **Interpretation; Construction**.  The headings set forth in this Agreement are for convenience only and shall not be used in interpreting this Agreement.  The Parties acknowledge that each Party and its counsel have reviewed and revised, or had an opportunity to review and revise, this Agreement, and the normal rule of construction to the effect any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

(j)  **Injunctive Relief**.   In the event that Executive breaches any restrictive covenant, the Company shall be entitled to an injunction restraining Executive from violating such restrictive covenant (without posting any bond or other security).  If the Company institutes any action or proceeding to enforce any such restrictive covenant, Executive hereby waives the claim or defense that the Company has an adequate remedy at law and agrees not to assert in any such action or proceeding the claim or defense that the Company has an adequate remedy at law.

DocuSign Envelope ID: 475DC136-7E46-4G16-BACB-25193A124350

(k)     **Attorneys' Fees**.  In any controversy or claim arising out of or relating to this Agreement or the breach thereof, which results in legal action, proceeding or arbitration, the prevailing party in such action, as determined by the court or arbitrator, shall be entitled to recover reasonable attorneys' fees and costs incurred in such action.

(l)     **Counterparts; Facsimile**.  This Agreement may be executed and delivered (including by facsimile, .pdf or similar electronic transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement

(m)     **Representations and Warranties**.  Executive represents and warrants that he is not restricted or prohibited, contractually or otherwise, from entering into and performing each of the terms and covenants contained in this Agreement, and that his execution and performance of this Agreement will not violate or breach any other agreement between Executive and any other person or entity.  Executive affirms that he has no agreement with any other party that would preclude his (her) compliance with any obligations under this Agreement.

(n)     **Preservation of Property**.  Executive will exercise reasonable care, consistent with good business judgment to preserve in good working order, subject to reasonable wear and tear from authorized usage, and to prevent loss of, any equipment, instruments or accessories of the Company in his custody for the purpose of conducting the business of the Company.  Upon request, Executive will promptly surrender the same to the Company at the conclusion of his employment, or if not surrendered, Executive will account to the Company to its reasonable satisfaction as to the present location of all such instruments or accessories and the business purpose for their placement at such location.   At the conclusion of Executive's employment with the Company, he agrees to return such instruments or accessories to the Company or to account for same to the Company's reasonable satisfaction.

*(Signature page follows)*

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the Effective Date.

Skyline Capital Builders LLC, a California                    EXECUTIVE:
limited liability company

By: _____Sean Holliday_____                             By: _____Greg Loy_____
        3D2AD37CF512469...                                           824E98EEAB494DD...
Name: _____Sean Holliday_____                           Name: _____Greg Loy_____
Title: _____President_____                              Title: _____Executive_____

11

# EXHIBIT A

## DEFEND TRADE SECRETS ACT, 18 U.S. CODE § 1833 NOTICE:

18 U.S. Code Section 1833 provides as follows:

**Immunity From Liability For Confidential Disclosure Of A Trade Secret To The Government Or In A Court Filing.** An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made, (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

**Use of Trade Secret Information in Anti-Retaliation Lawsuit.** An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual (A) files any document containing the trade secret under seal; and (B) does not disclose the trade secret, except pursuant to court order.

# EXHIBIT B

## LIST OF EXCLUDED INVENTIONS UNDER SECTION 4

| <u>Title</u> | <u>Date</u> | Identifying Number<br><u>or Brief Description</u> |
|---|---|---|
| N/A | N/A | N/A |

N/A
_____ No inventions, improvements, or original works of authorship

N/A
_____ Additional sheets attached

Signature of Executive: _Greg Loy_
                        C24F0CE5AB194DB...

Print Name of Executive: Greg Loy

Date: 10/26/2020

# EXHIBIT C

## CALIFORNIA LABOR CODE 2870 NOTICE:

California Labor Code Section 2870 provides as follows:

> Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either: (1) relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (2) result from any work performed by the employee for the employer. To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under California Labor Code Section 2870(a), the provision is against the public policy of this state and is unenforceable.

**EXHIBIT D**

**EXECUTIVE ARBITRATION AGREEMENT**

THIS ARBITRATION AGREEMENT ("**Agreement**") is made by and between Skyline Capital Builders LLC, a California limited liability company ("**Company**") and Greg Loy ("**Executive**").

The purpose of this Agreement is to establish final and binding arbitration for all disputes arising out of Executive's relationship with Company, including without limitation Executive's employment or the termination of Executive's employment.  Executive and Company desire to arbitrate their disputes on the terms and conditions set forth below to gain the benefits of a speedy, impartial dispute-resolution procedure.  Executive and Company agree to the following:

1.    Claims Covered by the Agreement.  To the fullest extent permitted by law, and subject to the limitations on arbitration set forth in subpart (a) below, Executive and the Company (collectively, the "**parties**") agree as follows:

(a)    The parties agree to submit to mandatory binding arbitration any and all claims arising out of or related to Executive's employment with the Company and the termination thereof (the "**Arbitrable Claims**"), except as follows:  This arbitration section does not restrict Executive's right to file (A) claims in court for violation of the California Labor Code, including on a representative action basis under California Labor Code Sections 2698, *et seq*., or the California Fair Employment and Housing Act; or (B) administrative claims before any government agency where, as a matter of law, Executive has the right to file such administrative claims (including, but not limited to, the National Labor Relations Board, the Equal Employment Opportunity Commission, the Department of Labor, and applicable state and local agencies, including the California Department of Fair Employment and Housing).

(b)    This arbitration section is governed by and will be construed in accordance with the Federal Arbitration Act, 9 U.S.C. 1, *et seq*.

2.    Required Notice of Claims and Statute of Limitations.  For all (i) Arbitrable Claims, and (ii) claims covered by paragraph 1(a) above that Executive voluntarily elects to adjudicate through arbitration rather than in court, Executive may initiate arbitration by serving or mailing a written notice to the Company's Board of Directors.  Company may initiate arbitration by serving or mailing a written notice to Executive at the last address recorded in Executive's personnel file.  The written notice must specify the claims asserted against the other party.  Notice of any claim sought to be arbitrated must be served within the limitations period established by applicable federal or state law.

3.    Arbitration Procedures.

a. After demand for arbitration has been made by serving written notice under the terms of paragraph 2 of this Agreement, the party demanding arbitration shall file a demand for arbitration with the American Arbitration Association ("**AAA**") in San Diego County, California

b. Except as provided herein, all rules governing the arbitration shall be the then applicable rules set forth by the AAA. If the dispute is employment-related, the dispute shall be governed by the AAA's then current version of the national rules for the resolution of employment disputes. The AAA's then applicable rules governing the arbitration may be obtained from the AAA's website which currently is www.adr.org.

c. The arbitrator shall apply the substantive law (and the law of remedies, if applicable) of the state in which the claim arose, or federal law, or both, as applicable to the claim(s) asserted. The arbitrator shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement, including but not limited to any claim that all or any part of this Agreement is void or voidable.

d. Either party may file a motion for summary judgment with the arbitrator. The arbitrator is entitled to resolve some or all of the asserted claims through such a motion. The standards to be applied by the arbitrator in ruling on a motion for summary judgment shall be the applicable laws as specified in paragraph 4(c) of this Agreement.

e. Discovery shall be allowed and conducted pursuant to the then applicable arbitration rules of the AAA. The arbitrator is authorized to rule on discovery motions brought under the applicable discovery rules.

4. <u>Application for Emergency Injunctive and/or Other Equitable Relief</u>. Claims by Company or Executive for emergency injunctive and/or other equitable relief relating to unfair competition and/or the use and/or unauthorized disclosure of trade secrets or confidential information shall be subject to the then current version of the AAA's Optional Rules for Emergency Measures of Protection set forth within the AAA's Commercial Dispute Resolution Procedures. The AAA shall appoint a single emergency arbitrator to handle the claim(s) for emergency relief. The emergency arbitrator selected by the AAA shall be either a retired judge or an individual experienced in handling matters involving claims for emergency injunctive and/or other equitable relief relating to unfair competition and the use or unauthorized disclosure of trade secrets and/or confidential information.

5. <u>Arbitration Decision</u>. The arbitrator's decision will be final and binding. The arbitrator shall issue a written arbitration decision revealing the essential findings and conclusions upon which the decision and/or award is based. A party's right to appeal the decision is limited to grounds provided under applicable federal or state law.

6. <u>Place of Arbitration</u>. The arbitration will be at a mutually convenient location that must be within 50 miles of Executive's last company employment location. If the

16

DocuSign Envelope ID: 475DC136-7E46-4616-BA5E-35193A124350

parties cannot agree upon a location, then the arbitration will be held at the AAA's office nearest to Executive's last employment location.

7.  <u>Construction</u>.  Should any portion of this Agreement be found to be unenforceable, such portion will be severed from this Agreement, and the remaining portions shall continue to be enforceable.

8.  <u>Representation, Fees and Costs</u>.  Each party may be represented by an attorney or other representative selected by the party.  Except as otherwise provided for by statute, the arbitrator shall award reasonable attorneys' fees and costs (including without limitation, costs for depositions, experts, etc.) to Executive provided Executive is the prevailing party except that Company shall be responsible for the arbitrator's fees and costs, or any fees or costs charged by the AAA, to the extent they exceed any fee or cost that Executive would be required to bear if the action were brought in court.  Unless permitted by applicable law, Executive shall not be responsible for attorneys' fees and costs of Company.

9.  <u>Waiver of Jury Trial/Exclusive Remedy</u>.  SUBJECT TO THE LIMITATIONS SET FORTH IN PARAGRAPH 1(A), EXECUTIVE AND COMPANY KNOWINGLY AND VOLUNTARILY WAIVE ANY CONSTITUTIONAL RIGHT TO HAVE ANY ARBITRABLE CLAIMS BETWEEN THEM DECIDED BY A COURT OF LAW AND/OR BY A JURY IN COURT.

10.  <u>Sole and Entire Agreement</u>.  This Agreement expresses the entire Agreement of the parties and shall supersede any and all other agreements, oral or written, concerning arbitration.  This Agreement is not, and shall not be construed to create, any contract of employment, express or implied.

11.  <u>Requirements for Modification or Revocation</u>.  This Agreement to arbitrate shall survive the termination of Executive's employment.  It can only be revoked or modified by a writing signed by the President of the Company and Executive that specifically states an intent to revoke or modify this Agreement.

12.  <u>Voluntary Agreement</u>.  EXECUTIVE ACKNOWLEDGES THAT EXECUTIVE HAS CAREFULLY READ THIS AGREEMENT, UNDERSTANDS ITS TERMS, AND AGREES THAT ALL UNDERSTANDINGS AND AGREEMENTS BETWEEN COMPANY AND EXECUTIVE RELATING TO THE SUBJECTS COVERED IN THE AGREEMENT ARE CONTAINED IN IT.  EXECUTIVE HAS KNOWINGLY AND VOLUNTARILY ENTERED INTO THE AGREEMENT WITHOUT RELIANCE ON ANY PROVISIONS OR REPRESENTATIONS BY COMPANY, OTHER THAN THOSE CONTAINED IN THIS AGREEMENT.

EXECUTIVE FURTHER ACKNOWLEDGES THAT EXECUTIVE HAS BEEN GIVEN THE OPPORTUNITY TO DISCUSS THIS AGREEMENT WITH EXECUTIVE'S PRIVATE LEGAL COUNSEL AND EXECUTIVE HAS UTILIZED THAT OPPORTUNITY TO THE EXTENT DESIRED.

EXECUTIVE:

By: _Greg Loy_
Name: Greg Loy
Title _____Executive_____

COMPANY:

Skyline Capital Builders LLC, a California
limited liability company

By: _Sean Holliday_
Name: Sean Holliday
Title _____President_____